879 F.2d 1122
 WEST, Marie, individually and on behalf of all others
similarly situated
v.
BOWEN, Otis R. individually and in his capacity as Secretary
of the United States Department of Health and Human Services
Lyng, Richard E. individually and in his capacity as
Secretary of the United States Department of Agriculture
White, John F., Jr. individually and in his capacity as
Secretary of the Pennsylvania Department of Public Welfare
and Stovall, Don Jose individually and in his capacity as
Executive Director of the Philadelphia County Assistance Office.
Appeal of Marie E. WEST, individually and on behalf of the
classes she represents, Class A and Class B.
 No. 88-1475.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 1, 1988.
Decided June 30, 1989.
Rehearing and Rehearing In Banc Denied Sept. 11, 1989.
 
 George D. Gould, Peter D. Schneider, Community Legal Services, Inc., Philadelphia, Pa., David A. Super (argued), Food Research & Action Center, Inc., Washington, D.C., for appellants.
 John R. Bolton, Asst. Atty. Gen., Thomas H. Lee, II, Acting U.S. Atty., Anthony J. Steinmeyer, Constance A. Wynn (argued), Robert Greenspan, U.S. Dept. of Justice, Civ. Div., Appellate Branch, Washington, D.C., for appellee, Otis R. Bowen, Secretary of Health and Human Services.
 LeRoy S. Zimmerman, Atty. Gen., Michael L. Harvey (argued), Deputy Atty. Gen., George R. Neuhauser, Sr. Deputy Atty. Gen., John G. Knorr, III, Chief Deputy Atty. Gen., Chief, Litigation Section, Office of Atty. Gen., Harrisburg, Pa., for appellees, White & Stovall.
 Before HIGGINBOTHAM, MANSMANN, and GARTH, Circuit Judges
 OPINION OF THE COURT
 GARTH, Circuit Judge.
 
 
 1
 Plaintiff/Appellant, Marie West ("West"), individually, and as the representative of two different classes of individuals who claim that they have not received food stamp benefits to which they are entitled, appeals from a summary judgment order entered in favor of Defendant/Appellee, Bowen, Secretary of the Department of Health and Human Services ("HHS"), and other governmental defendants with respect to both classes. We will affirm the district court's judgment as it concerns Class A, and reverse with respect to Class B.[1]
 
 I.
 
 2
 While West's original complaint[2] seeking SSI disability benefits was pending, West amended her complaint to include allegations that her rights under the Food Stamp Act were being violated by HHS, the United States Department of Agriculture ("USDA") and the Pennsylvania Department of Public Welfare ("DPW"). West alleged two separate violations: she first charged that although she received SSI disability benefits which accrued to her from the date she applied for the benefits (May, 1983) to the date she began receiving benefits pursuant to the district court's order, she only received food stamp benefits from the date of the district court's order awarding her disability benefits (July, 1985). West claims that just as she was entitled to SSI benefits from the date of her application, she was entitled to recover food stamp benefits retroactively, i.e., from the date of her disability application.
 
 
 3
 West's second complaint was that USDA in administering the food stamp program, improperly included as income, when calculating her food stamp benefits, monies which West received from DPW as reimbursement for utility expenses.
 
 
 4
 The district court certified two classes of claimants: Class A claimants who seek retroactive food stamp benefits, and Class B claimants who seek relief from the allegedly improper inclusion of utility rebates in income. All parties moved for summary judgment and the district court ruled against West on all of her class action claims. West appeals.
 
 II.
 
 5
 Before turning our attention to the merits of West's claims, we address our standard of review. The issues presented here require us to review the Secretary of Agriculture's interpretation of the Food Stamp Act in accordance with the following instruction:When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction of the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
 
 
 6
 Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984) (footnotes omitted). See also Wheeler v. Heckler, 787 F.2d 101, 104 (3d Cir.1986) ("We must defer to [the Secretary's] construction, as long as it is reasonable and not arbitrary and capricious."); Pennsylvania v. United States, 752 F.2d 795, 798 (3d Cir.1984) ("[A] reviewing court must uphold the agency's interpretation if it is reasonable, notwithstanding the court's belief that some other policy was preferable.")
 
 
 7
 Thus, in the absence of Congress' unambiguously expressed intent, we are bound to defer to the Secretary's interpretation, if that interpretation is reasonable and based on a permissible construction of the statute, in this case 7 U.S.C. Sec. 2012(r), see note 3, infra.
 
 III.
 
 8
 The Food Stamp Act, 7 U.S.C. Secs. 2011, et seq. ("The Act"), establishes a federally funded, state administered program to supplement the food purchasing power of eligible individuals. Participants receive coupons which can be used to purchase food from regular stores. 7 U.S.C. Sec. 2013(a). Eligibility for participation in the food stamp program is based on a household's gross income, which includes income from whatever source, subject to certain exemptions and deductions. 7 U.S.C. Sec. 2014(d). Generally, as an individual's income goes up, the amount of his food stamp allotment goes down.
 
 
 9
 The Act affords special treatment for elderly and disabled people who apply for food stamps. For example, only elderly or disabled people may claim defined medical expenses as deductions when computing their income to determine their food stamp allotment, 7 U.S.C. Sec. 2014(e)(A), and only elderly or disabled individuals may deduct the full amount of their shelter costs when computing their income. 7 U.S.C. Sec. 2014(e)(C). For the purposes of the Food Stamp Act, a disabled person is someone who "receives" Social Security disability payments. 7 U.S.C. Sec. 2012(r)(2), (3).[3]
 
 
 10
 It is this definition of "disabled" which has given rise to the present appeal of the Class A members. When an individual is already receiving Social Security disability benefits, an application for food stamps can be processed immediately. However, when an individual applies for both disability benefits and food stamps at the same time, the food stamp application is held pending a determination by the Social Security Administration that the individual applicant is entitled to disability benefits. This time period is referred to as the "disability determination period." In many cases, it is not uncommon for a substantial amount of time to elapse before a final determination is made that an individual is entitled to disability benefits. In West's case, it took over two years. During this time period, she did not receive benefits of any kind.
 
 
 11
 Because West was ultimately successful in her disability appeal from the ALJ to the district court, she received a lump sum payment from SSA covering the time period from the date she first applied for disability benefits through the date that she began receiving them pursuant to the district court's order. In other words, she received a lump sum payment for the entire "disability determination period." However, even though it was determined that she was also entitled to food stamps for the same time period, the USDA refused to issue food stamps for that period.
 
 
 12
 The USDA based its refusal to issue the stamps retroactively on its interpretation of the word "receive." As noted previously, 7 U.S.C. Sec. 2012(r) provides for food stamps based on the disability of an individual who is "receiving" Social Security benefits. USDA claims that since West was not actually "receiving" disability benefits during the "disability determination period," she was not entitled to retroactive food stamps covering that time period.
 
 
 13
 USDA initially took the position, i.e., that retroactive payments were inappropriate, with respect to all disabled applicants for food stamps. USDA subsequently modified its position and allowed retroactive payments of food stamps when the applicant was "categorically eligible." 51 Fed.Reg. 28196, 28200 (August 5, 1986). A "categorically eligible" person is someone who lives in a household where every member of the household receives some form of federal assistance. 7 U.S.C. Sec. 2014(a). The regulation only allows for retroactive food stamp payments for "disability determination periods" after December 23, 1985, the date Congress enacted the statute which recognized "categorical eligibility". USDA concedes that this statute recognizing categorically eligible people, now codified at 7 U.S.C. 2014(a), does not require retroactive payments. (A. 461). Nevertheless, USDA has decided to make retroactive payments as a matter within its discretion.
 
 
 14
 To summarize: Since disability status for purposes of the Food Stamp Act is acquired only upon certification and notification to USDA of an individual's disability determination, the Secretary of Agriculture has taken the position that noncategorically eligible persons are barred from recovering retroactive food stamp benefits even for periods determined by the Secretary of HHS to actually have been periods of disability.
 
 IV.
 
 15
 West reaises a number of arguments in opposition to the USDA's ruling. First, West argues that the statute reads that a person is considered disabled if he or she "receives supplemental security income benefits under Title XVI of the Social Security Act...." 7 U.S.C. Sec. 2012(r). West points out that the statute, contrary to the Secretary's reading, does not read "receives supplemental benefits during the month for which they are intended." West argues that in effect, USDA has inserted into the statute, the words which we have underlined.
 
 
 16
 West also notes that the section which establishes "categorical eligibility" uses virtually the same language as Sec. 2012(r). Thus, a person is categorically eligible if every person in his household "receives ... supplemental security income benefits under Title XVI of the Social Security Act...." 7 U.S.C. Sec. 2014(a). West argues that because USDA permits retroactive payments to categorically eligible applicants, the effect of USDA's actions in refusing retroactive payments under Sec. 2012(r) but authorizing retroactive payments under Sec. 2014(a), is to give the word "receives" as it appears in both Sec. 2012(r) and Sec. 2014(a), two entirely different meanings. West claims Congress could not have intended such a result.
 
 
 17
 West also presents two alternative arguments: (1) that USDA's actions amount to unlawful discrimination against the disabled; and (2) that the refusal to grant retroactive benefits amounts to a denial of due process. We will address the statutory argument first, and then turn our attention to the alternate arguments that West makes.
 
 A.
 
 18
 In addressing West's statutory argument, the district court felt itself constrained by Commonwealth of Pennsylvania v. United States, 752 F.2d 795 (3d Cir.1984). In that case, Pennsylvania sought reimbursement from the federal government for AFDC payments made to individuals who ultimately received SSI benefits. 42 U.S.C. Sec. 602(a)(24) forbids an individual from "receiving" both SSI and AFDC.[4] The issue in Commonwealth arose from the varying funding responsibilities of the States and the federal government with respect to SSI benefits and AFDC benefits, and the federal government's methods for ensuring that no individual "receives" the benefit of both types of public assistance in violation of 42 U.S.C. Sec. 602(a)(24).
 
 
 19
 The Commonwealth court set forth the circumstances of that case as follows: The State (Pennsylvania) funds approximately half of an individual's AFDC benefits. The federal government funds the other half. However, the federal government provides funding for all of an individual's SSI benefits. Often, while an SSI application is pending, the SSI applicant is receiving AFDC benefits. When the SSI application is ultimately approved, the federal government sets off any AFDC payments received by that individual during the "disability determination period," against the first lump-sum SSI payment. This lump-sum SSI payment covers the "disability determination period." The effect of this practice is to prevent an individual from receiving the benefit of both AFDC and SSI benefits.
 
 
 20
 Pennsylvania complained that it had paid for approximately fifty percent of the AFDC benefits that an individual with a pending SSI application had received, but that it was precluded from sharing in any recoupment which resulted from the federal government setting off AFDC benefits against the initial lump-sum SSI payment.
 
 
 21
 The federal government adopted the set off policy challenged in Commonwealth, by interpreting the words "receiving" and "received" in Sec. 602(a)(24) to mean actual receipt by the beneficiary of a benefit check. See note 4, supra. Thus, the Social Security Administration reasoned that it was not required to reimburse Pennsylvania for making AFDC payments to an individual who ultimately became entitled to SSI benefits because such individuals were not actually "receiving" the SSI payments during the time AFDC payments were being made. In light of our prescribed standard of review, we found the SSA's interpretation of the Sec. 602(a)(24) to be reasonable and, therefore, denied reimbursement to Pennsylvania.
 
 
 22
 West seeks to distinguish Commonwealth. She notes that the Commonwealth court was construing a different statute than the statute at issue here. Furthermore, West argues, the question in Commonwealth concerned reimbursement to the state and did not concern whether an individual should receive retroactive benefits. While it is true that this court in Commonwealth addressed a different statute, and that the issue on appeal did not concern an individual's claim for benefits, nevertheless, we find that Commonwealth persuasive in analyzing the issue before us today, i.e., whether the USDA's interpretation of the word "receive" as it appears in Sec. 2012(r), is a reasonable interpretation, and thus entitled to deference.
 
 
 23
 West argues that USDA is not entitled to significant deference because it has not maintained a consistent interpretation of the word "receives." See Natural Resources Defense Council v. U.S. Environmental Protection Agency, 683 F.2d 752, 760 (3d Cir.1982) ("sharp changes of agency course constitute 'danger signals' to which a reviewing court must be alert."). Initially, USDA required that food stamp applicants have their first SSI check in hand before they could be deemed eligible for food stamps. Subsequently, USDA relaxed that requirement and did not require the actual receipt of an SSI check before an individual could qualify for disability food stamp preferences. In at least three types of circumstances, USDA authorized food stamps where the recipient had not as yet "received" SSI disability checks: (1) where the disability determination had been adjudicated but where disability payments had not been received; (2) where a disability payment for a particular month was not made because of previous disability benefit overpayments; and (3) where retroactive payments were made to "categorically eligible" beneficiaries.
 
 
 24
 Before us, USDA counters this argument by contending that an agency is entitled to change its mind, that the policy changes delineated by West were minor, and that in any event, those changes in policy favor rather than disfavor the class represented by West. West in turn responds that these changes underscore the arbitrary and capricious nature of USDA's interpretation and amount to unlawful discrimination against the handicapped under Section 504 of the Rehabilitation Act.[5]
 
 
 25
 While it is true that USDA has modified its position in these particulars, we are not persuaded that these policy determinations amount to the type of inconsistent action which must divest the agency of the deference to which it is normally entitled. In Natural Resources Defense Council v. U.S. Environmental Protection Agency, 683 F.2d 752, 760 (3d Cir.1982), we held that where an agency has sharply changed its substantive policy, a reviewing court must scrutinize the agency's actions more closely and in doing so, not accord the same deference to the agency's interpretation of statutes and regulations, as might otherwise be the case. The plaintiffs in Natural Resources challenged the Environmental Protection Agency's ("EPA") decision to defer indefinitely the effective date of regulations promulgated pursuant to Sec. 307(b)(1) of the Clean Water Act, 33 U.S.C. Sec. 1317(b)(1). These regulations would have controlled the discharge of toxic pollutants into publicly owned sewage treatment plans. We observed that EPA had "without notice and the opportunity for comment, abrogated rules which had been proposed, which had undergone years of notice and comment procedures, and which had been promulgated, with an effective date, in final form." We therefore concluded that EPA's actions were not entitled to full deference. Id.
 
 
 26
 Here, however, the record does not disclose the sharp reversals of policy by USDA, similar to those we confronted in Natural Resources. Absent such major reformulations of policy, we remain bound to our traditional standard of deference. We, therefore, hold that the Secretary is entitled to the deference owed to him by our standard of review and conclude that his construction of Sec. 2012(r) precluding retroactive food stamp payments is reasonable.[6]
 
 B.
 1.
 
 27
 The first of West's alternate arguments implicates alleged unlawful discrimination against the disabled. Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. Sec. 794, provides: "No otherwise qualified individual with handicaps * * * shall solely by reason of his handicap, be excluded from the participation in, the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance * * *."
 
 
 28
 First, she claims that the effect of USDA's policy is to deny disabled individuals retroactive payments of food stamps to which they are entitled. See note 5, supra. At the same time, West asserts that USDA permits nondisabled individuals who are otherwise entitled to food stamps, to receive such retroactive food stamp payments in the event that such payments have been wrongfully withheld or denied. 7 U.S.C. Secs. 2020(e)(11) and 2023(b), see note 5, supra.[7]
 
 
 29
 The district court rejected this argument, noting that the distinction of which West complains stems directly from Congress' choice in defining a disabled individual (for the purpose of receiving food stamps) as an individual who is "receiving" SSI benefits. Thus West, and the members of Class A, have not suffered because of their handicaps. Rather they have been denied retroactive food stamps because Congress has chosen to define their eligibility for benefits in the manner that it did. Thus, West's argument that disabled and non-disabled individuals are treated differently is flawed because in the case of disabled individuals, no wrongful denial has occurred until a disability determination has been made. See note 5, supra.
 
 2.
 
 30
 West's second alternative argument raises a due process claim. She argues that the length of time it takes SSA to reach a determination that a person is disabled, amounts to a denial of due process, because no food stamp payments are made during that interval. We need not tarry long on this point as we find no merit to her argument. Congress has chosen SSA to make the necessary disability determinations called for under the statute. We know of no fundamental right mandating the time in which such a determination must be made. As the district court concluded, "the method established by Congress in Sec. 2012(r) for determining who is disabled and hence eligible for the food stamp preferences, fully comports with due process and provides Class A's members with a meaningful opportunity to establish their entitlement." (A. 56). The process Congress has chosen for making such disability determinations is reviewed under a rational basis test. Clearly, the statutory process invoked by Sec. 2012(r) survives such a review.
 
 C.
 
 31
 Because we hold that the Secretary's interpretation of Sec. 2012(r) is a reasonable interpretation to which we must defer, and because the alternative arguments advanced by West are arguments best addressed to the legislature and not the courts, we will affirm the judgment of the district court with respect to the Class A claimants. We turn now to the claims which West asserts on behalf of the Class B members.
 
 V.
 
 32
 Pursuant to the Housing Act 42 U.S.C. Sec. 1401, et seq., Public Housing Authorities (PHA's) operate housing assistance programs under contract with the Department of Housing and Urban Development (HUD). Housing is typically rented to low income residents. The rent paid by a public housing resident covers all of that resident's housing costs, including utilities, 24 C.F.R. Sec. 960.403(a). Under the Brooke Amendment to the Housing Act, the rent can amount to no more than 30% of a resident's adjusted gross income. 42 U.S.C. Sec. 1437a(a)(1); 24 C.F.R. Sec. 960.404.
 
 
 33
 Prior to 1981, the utilities in multi-resident apartment buildings were metered on an aggregate basis, with one meter measuring the utility use of the entire building. Charges for utility use in such a building were included in the rent charged each resident, which as noted, could not exceed 30 percent of a resident's adjusted gross income.
 
 
 34
 In 1981, HUD began requiring local PHA's to install individual utility meters for each unit of public housing so that each resident was billed individually for the utilities consumed. 24 C.F.R. Sec. 965.401-410. Because utility costs are included in the maximum permissible rent allowed by the Brooke Amendment, residents of public housing whose units are individually metered receive "utility reimbursements" from the PHA's. These reimbursements are calculated on a city-wide average and do not reflect the actual individual expense incurred.[8] If these utility reimbursements amount to less than a resident's contract rent (limited to 30% of income), the reimbursement is credited against the rent and the resident pays the difference. If the utility reimbursements are more than the contract rent, the resident receives another check representing the difference between the rent and the utility reimbursement as a "utility rebate". Residents must pay their individual utility bills directly to the utility company or they are evicted.
 
 
 35
 USDA treats the "utility rebate" as income for the purposes of calculating an individual's food stamp allotment. By doing so, USDA has lowered West's and the members of Class B's food stamp benefits. West claims that this action by USDA is contrary to the clear language of the Food Stamp Act. She also claims that treating "utility rebates" as income results in a due process/equal protection violation.
 
 A.
 
 36
 The following example roughly approximates the difference in income and expenses experienced by residents of low income housing under a group metering system and under an individual metering system. The example assumes a monthly utility bill of $50, a monthly "utility reimbursement" of $50, and a monthly adjusted gross income of $100 with a maximum rent therefore of $30:
 
 
 37
 Total out of pocket expenses for Rent + Utilities = $30.
 
 B.
 
 38
 As noted earlier, income, for the purposes of the Food Stamp Act, includes "all income from whatever source" with certain exemptions and deductions. 7 U.S.C. Sec. 2014(d). West points to 7 U.S.C. Sec. 2014(d)(11), as the exemption applicable to utility rebates. That statute exempts from income:
 
 
 39
 any payments or allowances made under (A) any Federal law for the purpose of providing energy assistance, or (B) any State or local law for the purpose of providing energy assistance, designated by the State or local legislative body authorizing such payments or allowances as energy assistance....
 
 
 40
 Id. (emphasis added).
 
 
 41
 The district court examined the language of this statute and concluded that it did not exempt the utility rebates at issue here. The district court decided that in order for a "utility rebate" to be exempted from income, it must be a rebate authorized under a federal law, and that the federal law must be designed to provide energy assistance. In other words, the district court concluded that the purpose of the federal law must be to provide energy assistance.
 
 
 42
 The district court then turned to the question of whether the Housing Act, under which a "utility rebate" is paid, is a federal law whose purpose it is to provide energy assistance. The district court concluded that the Housing Act was designed to provide housing assistance and not energy assistance, and, therefore, a "utility rebate" did not qualify under this exemption. The district court noted that another district court in South Carolina, in Mitchell v. Block, No. 82-3297-2 (D.S.C. June 22, 1983), had reached the same conclusion, and that if Congress had wanted to simply exempt all energy assistance payments from income it could have so provided. On appeal the USDA adopts the district court's reading of the statute.
 
 
 43
 West, of course, reads the statute differently. West argues that the clause "for the purpose of providing energy assistance" modifies the preceding clause" "any payments or allowances." In essence, West argues that in order for a utility rebate to be exempted from income, it need only: (1) be authorized under a federal law; and (2) be for utilized energy assistance excluded from income under FSA. West reinforces her reading of the statute by noting that in conference. Congress rejected a Senate proposal that would have exempted only those "payments or allowances specifically designated for federal energy assistance by federal law." H.Rep. 97-377, reprinted at 1981 U.S.Code Cong. and Admin.News 1965, 2314. West quotes the remarks of Rep. Richmond, the primary House sponsor of the bill who stated:
 
 
 44
 All Federal payments for the purpose of providing energy assistance would continue to be excluded as income, whether or not specifically designated for energy assistance. It is the purpose for which they are given and not their label that governs.
 
 
 45
 127 Cong.Rec. H9878 (December 16, 1981). West concedes that the impetus for creating this exemption was the creation of federal programs like the Low-Income Home Energy Assistance Program, but West argues, it was the clear intent of Congress, as demonstrated by the language and legislative history, not to restrict the exemption to just these programs.
 
 
 46
 Given this legislative history, it is our judgment that USDA has unreasonably construed 7 U.S.C. Sec. 2014(d)(11), and in effect has resurrected the defeated Senate language. In Bethlehem Steel v. E.P.A., this court stated:
 
 
 47
 While deference is due to the interpretation of a statutory term by the officers or agency charged with its administration ... not all administrative interpretations of regulatory statutes will be accepted. We are constrained by our obligation to "honor the clear meaning of a statute, as revealed by its language, purpose and history."
 
 
 48
 651 F.2d 861-68 (3d Cir.1981) (quoting International Brotherhood of Teamsters v. Daniel, 439 U.S. 551, 556 n. 20, 99 S.Ct. 790, 800 n. 20, 58 L.Ed.2d 808 (1979) (citations omitted).
 
 
 49
 Recent Supreme Court jurisprudence supports our conclusion. In Bowen v. American Hospital Associating, 476 U.S. 610, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986), the Supreme Court struck down a regulation promulgated under the Rehabilitation Act. The Court stated:
 
 
 50
 Agency deference has not come so far that we will uphold regulations whenever it is possible to conceive a basis for administrative action. To the contrary, the presumption of regularity afforded an agency in fulfilling its statutory mandate is not equivalent to the minimum rationality a statute must bear in order to withstand analysis under the Due Process Clause.
 
 
 51
 Id. 106 S.Ct. at 2112.
 
 
 52
 Our decision in this matter is also supported by the most recent actions of Congress. By way of the Hunger Prevention Act of 1988, Pub.L. 100-435, 102 Stat. 1645, Congress has now amended 7 U.S.C. Sec. 2014(d)(11) so that it now exempts as income:
 
 
 53
 any payments or allowances made for the purpose of providing energy assistance (A) under any Federal law, or (B) under any State or local laws, designated by the State or local legislative body authorizing such payments or allowances as energy assistance....
 
 
 54
 The Senate Report accompanying this change in the statute informs us that:
 
 
 55
 This section would change the order of the language of the Food Stamp Act's exclusion of energy assistance to clarify that USDA and local agencies do not need to conduct an inquiry into the purpose of a federal statute before excluding federal "payments for the purpose of energy assistance." The law as now written could be read to require this analysis.
 
 
 56
 The crucial question should be whether the purpose of the payment is energy assistance, not whether the statute, as a whole, is primarily for energy assistance or includes other human services as well. This change is not intended to change current policy.
 
 
 57
 S.Rep. 100-397 (June 25, 1988), at 28, 29, reprinted in 1988 United States Code, Congressional and Admin.News 2239 at 2266, 2267.
 
 
 58
 The government focuses on the last sentence in the Senate Report quoted above, i.e., "[t]his change is not intended to change current policy," arguing that if no change in current policy was intended, Congress has in effect ratified USDA's position of which it had to have been aware. The difficulty with the government's position is that it ignores the legislative history we have quoted above, as well as the significant change made to Sec. 2014(d)(11) by the Hunger Prevention Act of 1988 quoted above. Given Congress' clearly expressed intention, we are satisfied that all payments for energy assistance should be exempted from income when determining eligibility for food stamps.[10]
 
 
 59
 Finally, we are guided in our interpretation of the statute by the fact that USDA's position creates an arbitrary disadvantage for those residents of public housing who by chance reside in an apartment which is individually metered. That circumstance implicates equal protection concerns. It is a long-standing canon of construction that a statute should be read, whenever possible, to avoid constitutional entanglements. See Califano v. Yamasaki, 442 U.S. 682, 693, 99 S.Ct. 2545, 2553, 61 L.Ed.2d 176 (1979). The reading advocated forward by West, avoids the equal protection problem created by USDA's interpretation.[11]
 
 VI.
 
 60
 We have held that in deference to USDA's interpretation of 7 U.S.C. Sec. 2012(r) retroactive food stamp payments are not required. To that extent therefore, the judgment of the district court, dated December 17, 1987, in favor of the defendants as it pertains to West and the members of Class A will be affirmed.
 
 
 61
 We have also held that USDA's interpretation of 7 U.S.C. Sec. 2014(d)(11), denying utility rebates as exemptions to income, is an impermissible construction of the statute. To that extent therefore, the judgment of the district court, dated December 17, 1987, in favor of the defendants, as it pertains to West and the members of Class B, will be reversed, and the case remanded to the district court with the direction to enter judgment in favor of West and the members of Class B and for such other proceedings as may be appropriate consistent with this opinion.
 
 
 62
 Each party will bear its own costs.
 
 
 63
 MANSMANN, Circuit Judge, concurring and dissenting.
 
 
 64
 I concur fully in the opinion and judgment of the court with regard to the Class B plaintiffs. I respectfully dissent from the majority's treatment of the Class A plaintiffs on numerous grounds.
 
 
 65
 The grant of summary judgment concerning West's Class A claims should be reversed because the interpretation by the Secretary, United States Department of Agriculture ("the Secretary"), of the "receives" language in the Food Stamp Act ("FSA") is due little deference due to its sharply inconsistent interpretation and is contrary to the intent and purpose of Congress in providing food stamps to disabled low income persons.
 
 
 66
 Appellant, Marie West, who lives in public housing in Philadelphia, applied in May, 1983 for social security and SSI disability benefits based upon a severe mental impairment. Despite uncontradicted medical evidence of severe psychotic disturbances and a series of hospitalizations beginning in 1959 (one lasting thirteen months), the Social Security Administration ("SSA") denied her application at each stage of the administrative process. The magistrate's report, which the district court accepted without objection from the Department of Health and Human Services ("HHS"), found that in making his ruling the SSA's Administrative Law Judge disregarded "substantial and clear medical evidence to the contrary. Instead he undauntedly contorts the record, ignores material facts and substitutes his own subjective evaluation of plaintiff's symptoms."
 
 
 67
 More than two years after she filed her application, the district court reversed the SSA and ordered that West receive disability benefits. The court found that West became disabled in 1959 and ordered disability benefits retroactive to the date in 1983 that she applied for these benefits.
 
 
 68
 During the pendency of her disability appeal, the Pennsylvania Department of Public Welfare ("DPW"), the Pennsylvania agency responsible for administering the food stamp program in the state, denied West's application for food stamps. The district court below determined that "[h]ad West been found disabled by the SSA in June, 1983, as she should have been, she indisputably would have been eligible to benefit from the food stamp preferences accorded to the disabled beginning shortly thereafter, when she received her first check." The Secretary, however, refused to provide her with food stamps retroactively for the period during which she was pursuing her ultimately successful appeal of the denial of her disability benefits. The Secretary denied West food stamps, arguing that she had not "received" disability benefits as required by the Food Stamp Act ("FSA") until her first check arrived.
 
 I.
 
 69
 We begin any analysis of a statutory interpretation with the words of the statute. "In matters of statutory construction the duty of this Court is to give effect to the intent of Congress, and in doing so our first reference is of course to the literal meaning of the words employed." Flora v. United States, 357 U.S. 63, 65, 78 S.Ct. 1079, 1081, 2 L.Ed.2d 1165 (1958).
 
 
 70
 7 U.S.C. Sec. 2012(r) defines a disabled person as one who "receives supplemental security benefits under Title XVI ... [or] receives disability or blindness payments under Title I, II, X, XIV, or XIV of the Social Security Act."
 
 
 71
 The statute does not indicate, as the Secretary asserts, that food stamps will only be provided if benefits are received during the month for which they are intended. I agree with West that the most natural reading of the statute is that food stamp applicants are entitled to treatment as "disabled" persons in all months for which they receive disability or blindness benefits from SSA, whether those benefits are paid currently or retroactively.
 
 
 72
 While West makes a compelling argument based on rules of statutory construction that the word "receives" is unambiguous, I will defer to my colleagues on the panel, whose view that the word is ambiguous is perhaps the strongest evidence that it is so.
 
 
 73
 It is well settled that in general an agency's interpretation of a statute it is charged with enforcing is entitled to substantial deference, Chevron U.S.A. Inc. v. Natural Resources Defense Council, 467 U.S. 837, 843-45, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984); EPA v. National Crushed Stone Assn., 449 U.S. 64, 83, 101 S.Ct. 295, 306, 66 L.Ed.2d 268 (1980) (citing Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)), and must in general be upheld even if that interpretation is not the only permissible one or even the most reasonable. Grocery Town Market, Inc. v. United States, 848 F.2d 392, 396 (3d Cir.1988). There are, however, exceptions to this general rule.
 
 
 74
 While the Secretary correctly asserts that regulatory interpretations by the agency charged by Congress with administering a statute are entitled to substantial deference, this principle serves merely to establish the framework for judicial analysis; it does not resolve the entire dispute. Security Industries Assn. v. Board of Governors of Federal Reserve System, 468 U.S. 137, 104 S.Ct. 2979, 82 L.Ed.2d 107 (1984); Lynch v. Lyng, 872 F.2d 718, 724 (6th Cir.1989). See Chemical Mfrs. Assn. v. Natural Resources Defense Council, Inc., 470 U.S. 116, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985); Knebel v. Hein, 429 U.S. 288, 294 n. 14, 97 S.Ct. 549, 553 n. 14, 50 L.Ed.2d 485 (1977).
 
 
 75
 As we noted in Hi-Craft Clothing Co. v. NLRB, 660 F.2d 910 (3d Cir.1981) (holding supervisor not protected by NLRA and, although discharged for threatening NLRB action, not able to obtain enforcement of Board order of reinstatement), we should carefully analyze the circumstances in each case to determine if deference is due and, if so, how much. Id. at 914. "Without that scrutiny there is a danger that indiscriminate judicial deference may amount to judicial abdication." Weis, A Judicial Perspective on Deference to Administrative Agencies: Some Grenades from the Trenches, 2 Admin.L.J. 301, 307 (1988).
 
 II.
 
 76
 A. Reduced Deference Because of Inconsistency in Interpretation
 
 
 77
 Far less than the usual amount of deference to an agency interpretation is appropriate where the agency has failed to adopt a consistent interpretation in administering the statute in question. The Supreme Court has often determined that consistency in an agency's interpretation is a necessary ingredient for the granting of deference to that interpretation.[1]
 
 
 78
 We have often found consistency or lack thereof in an agency interpretation to be crucial in determining the degree of deference to be afforded that interpretation. See, e.g., Revak v. National Mines Corp., 808 F.2d 996, 1002 (3d Cir.1986) (rejecting deference argument due to inconsistent agency interpretation of statute); Disabled in Action of Pennsylvania v. Sykes, 833 F.2d 1113, 1117-19 (3d Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1293, 99 L.Ed.2d 503 (1988); South Hills Health System v. Bowen, 864 F.2d 1084, 1090 (3d Cir.1988) ("We find, however, that there is no inconsistency between HCFA's Medicare cost report disclosure rule and its other FOIA regulations. Accordingly, we will not intrude on the Secretary's determination."); N.L.R.B. v. Economics Laboratory, 857 F.2d 931, 935 (3d Cir.1988); id. at 939 (Higginbotham, J., dissenting); Natural Resources Defense Council v. U.S. Environmental Protection Agency, 683 F.2d 752, 760-61 (3d Cir.1982).
 
 
 79
 As the majority notes, in Natural Resources, supra, at 760, we held that where an agency, as was the scenario before us in that case, has sharply changed its substantive policy, we will not accord it the normal deference. Natural Resources, however, was not the only case in which we or the Supreme Court spoke to the issue of the impact of inconsistency in agency interpretation. Neither the Supreme Court nor ourselves have indicated that only in cases of sharp changes in policy will we reduce deference to an agency interpretation. What emerges from the cases is a sliding scale of deference with little deference given to great inconsistency and more, but not full, deference given to lesser inconsistency.
 
 
 80
 In any case, the facts before us indicate "sharp" inconsistency in the application of the term "receives." The Secretary's initial position was that only disabled persons receiving disability checks in hand during a month were entitled to disability status. Since the present action was filed, the Secretary has changed its interpretation of "receives" in three ways. First, those who have received notice of the fact that they will receive SSA benefits, although they have not actually "received" their first payment, will be considered as having "received" disability benefits under the FSA. USDA Policy Memo 85-15 (Apr. 12, 1985). Second, although they are not actually "receiving" an SSA payment in a current month, USDA will consider those whose payment is suspended because SSA is recouping a prior overpayment, as "receiving" disability benefits under the Act. Id. Third, USDA will consider those categorically eligible who have received delayed disability determinations since December, 1985 as having "received" disability payments for the full period from the date of their application for food stamps or December 23, 1985, whichever is later, during which their SSA determination was delayed and will provide retroactive food stamps benefits for that period. 7 C.F.R. Secs. 272.1(g)(78)(i).
 
 
 81
 Bonny O'Neil, Director, Program Development Division, FNS, USDA, the person who according to her declaration is "responsible for the development of policies and regulations consistent with the Food Stamp Act and any amending legislation," asserts that "FNS does not retroactively recalculate food stamp benefits unless required to do so by the Act or its implementing regulations." Yet in the same document she states that although "7 U.S.C. Sec. 2014(a) does not require FNS to recalculate a household's food stamp benefits ... [n]evertheless, FNS promulgated an interim regulation implementing the categorical eligibility rule which permits retroactive recalculation of food stamp benefits...." Declaration of Bonny O'Neil, Appendix at 461. While in some cases an evolving interpretation of statutory language may be reasonable, these statements add weight to the argument that the Secretary's interpretation of the word "receives" is arbitrary since in some instances he feels bound by his interpretation while in others, although not required to do so, he departs from the interpretation.[2]
 
 
 82
 The Secretary would have us believe that it is not inconsistent to allow a disabled person living in a household composed entirely of disabled persons (even, presumably, if that person lives on their own as a household of one) and, who is therefore, categorically eligible under 2014(a), to receive retroactive benefits for the period when their disability is being determined; while those who are disabled living in households where non-disabled persons also live, who suffer from the same disability and low income, are not permitted to receive retroactive food stamps.[3] Surely this is not only inconsistency but sharp inconsistency.
 
 
 83
 The Secretary claims that these inconsistencies are "minor." I take a different view. The Secretary in these changes has completely abandoned any pretense to consistency in the reading he asks us to give to the word "receives." He has sharply departed from the position which, as the majority puts it, argues that "receives" means "receives supplemental benefits during the month for which they are intended." These inconsistencies point to the arbitrary and capricious nature of the Secretary's reading of "receives." If the Secretary believes that he is required to give the term the meaning "received during the month for which intended," he will not convince me that this is required by arbitrarily deciding on one day that "receives" means something entirely different for a certain subgroup of claimants, and on another day that it has a different meaning for another subgroup of claimants, when Congress has given not the slightest hint that this should be so.
 
 
 84
 This case presents a classic example of inconsistency. The Secretary has not merely diverged slightly from the reading of "receives" he argues we should adopt--he has abandoned that interpretation completely in the three instances outlined above.
 
 
 85
 The fact, which the district court found favored the Secretary, that the "Secretary has, in effect, partially adopted plaintiffs' arguments" does not have the slightest bearing on the arbitrary nature of the Secretary's interpretation. The district court concludes that since these changes have been in a direction favorable to West they are, therefore, irrelevant. However, whether the vacillation in a policy interpretation is favorable to a party or moves in the opposite direction, does not affect the arbitrary nature of such an interpretation; in either case there should be a reduction in the quantum of deference afforded the interpretation. See, e.g., Jordan v. Lyng, 659 F.Supp. 1403, 1411 (E.D.Va.1987) (rejecting USDA interpretation which had changed over time in favor of recipients).
 
 
 86
 Given the reduced deference which should be afforded the FDA's interpretation, we should not lapse into "judicial inertia," Volkswagenwerk Aktiengesellschaft v. FMC, 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968) (quoting American Ship Bldg. Co. v. NLRB, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965)), " 'stand[ing] aside and rubber-stamp[ing] [our] affirmance of administrative decision that [we] deem inconsistent with a statutory mandate or that frustrate[ ] the congressional policy underlying a statute.' " Volkswagenwerk, 390 U.S. at 272, 88 S.Ct. at 935 (quoting NLRB v. Brown Food Store, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965)).
 
 
 87
 B. Reduced Deference Where No Agency Expertise Involved
 
 
 88
 In a recent food stamp retroactive benefits case, the Sixth Circuit refused to defer to the Secretary. "[T]he amount of weight accorded an agency interpretation diminishes further when the interpretation does not require special knowledge within the agency's field of technical expertise. There is nothing about the Secretary's expertise in administering the food stamp program that would make him better able to divine congressional intent as to effective dates." Lynch, 872 F.2d 718, 724. Likewise there is nothing about the Secretary's expertise in administering the food stamp program that would make him better able to divine congressional intent as to the point at which a disabled person receives social security benefits.
 
 
 89
 Similarly, the court in Jordon v. Lyng, 659 F.Supp. 1403, 1411 (E.D.Va.1987) refused Chevron deference to the Secretary's interpretation of "institution of higher learning" in the Food Stamp Act, in part, because the U.S.D.A.'s interpretation was not "the result of detailed rule-making in a complex area in which the agency has special expertise." The interpretation propounded by USDA in the case before us is likewise not one which involves a complex area in which the agency has special expertise.
 
 
 90
 When an agency interpretation is not rooted in its special expertise that interpretation will be given considerably less deference than an interpretation which grows out of an agency's special competence in a particular area. See, e.g., Slaughter v. NLRB, 876 F.2d 11, 18 (3d Cir.1989); U.S. Dept. of Navy v. F.L.R.A., 840 F.2d 1131, 1134 (3d Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 632, --- L.Ed.2d ---- (1988). As Judge Weis has written,
 
 
 91
 Arguments advocating judicial deference to agency statutory interpretations are simply not supportable in the absence of actual, not theoretical agency expertise or specific delegations of power. An argument for deference deserves careful consideration only when those factors are present. A judge has the duty to scrutinize closely each case and not defer blindly to administrative agency pronouncements.
 
 
 92
 Weis, supra, typescript p. 5, at 304.
 
 
 93
 C. Reduced Deference Where Other Agency's Statute Being Interpreted
 
 
 94
 There is also a sense in which the Department of Agriculture is not interpreting its own statute but rather the Social Security Act since it is seeking to determine when social security disability payments have been received.[4] No deference is owed an agency's interpretation of another agency's statute. Dept. of Navy, Military Sealift Command v. F.L.R.A., 836 F.2d 1409, 1410 (3d Cir.1988). See also U.S. Dept of Navy v. F.L.R.A., 840 F.2d 1131, 1134 (3d Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 632, 102 L.Ed.2d 170 (1988); New Jersey Air Nat. Guard v. F.L.R.A., 677 F.2d 276, 281-82 n. 6 (3d Cir.), cert. denied, 459 U.S. 988, 103 S.Ct. 343, 74 L.Ed.2d 384 (1982); Hi-Craft Clothing Co. v. NLRB, 660 F.2d 910, 916 (3d Cir.1981).[5]
 
 D. The Judicial Role in Interpretation
 
 95
 "It is emphatically, the province and duty of the judicial department to say what the law is." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). Similarly, Congress intended that we interpret statutory terms. The Administrative Procedure Act states: "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. Sec. 706.[6]
 
 
 96
 I would emphasize, as the Supreme Court has so often, that statutory construction is ultimately a judicial function.[7] Indeed, "one of the judiciary's roles is to interpret statutes." Japan Whaling Assn. v. American Cetacean Society, 478 U.S. 221, 106 S.Ct. 2860, 2866, 92 L.Ed.2d 166 (1986).
 
 
 97
 The Supreme Court in Chevron does not seem to me to be stating that mere silence of ambiguity in a statute automatically implies delegation to the agency of the full responsibility for interpretation, even when that interpretation is inconsistent and contrary to the purpose of the statute. "Indeed, it may be said that deference to an agency's interpretation reflects a judicial determination that the agency's interpretation falls within the scope of the authority that has been properly delegated by Congress to the agency." National Treasury Employees Union v. F.L.R.A., 810 F.2d 295, 297 (D.C.Cir.1987). See also Anthony, Which Agency Interpretations Should Get Judicial Deference? 40 Admin.L.Rev. 121, 126 (1986) ("If mere silence or ambiguity does not automatically amount to an 'implicit delegation' " under Chevron "does the responsibility for interpretation then lie with the court, according only Skidmore deference?"). As the court in Ethyl Corporation v. E.P.A., 541 F.2d 1 (D.C.Cir.) (en banc), cert. denied, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976), stated: "Congress has been willing to delegate its legislative powers broadly--and courts have upheld such delegation--because there is court review to assure that the agency exercises the delegated power within statutory limits." Id. at 68 (footnote omitted).
 
 E. Commonwealth
 
 98
 The district court gave "great weight" and felt "particularly constrained" by our decision in Pennsylvania v. United States, 752 F.2d 795 (3d Cir.1984) ("Commwonwealth "), which examined the meaning of the word "received" with regard to SSI benefits. It need not have felt so constrained.
 
 
 99
 In Commonwealth our determination was rooted not simply in deference to the agency, but was also based on the fact that the Secretary's interpretation was "consistent with other parts of the AFDC and SSI statutory schemes." Id. at 799. The case before us, as I have discussed, can be distinguished from Commonwealth in this regard. And, of course, Commonwealth "interpreted other language passed for other purposes governing another program (AFDC).... [It] analyzed different statutory language focusing upon financial eligibility, not the status of being disabled." Brief of West, at 14.
 
 
 100
 In contrast to Commonwealth, in Wheeler v. Heckler, 787 F.2d 101 (3d Cir.1986), a social security disability related case, we determined that the receipt of SSI benefits in question should be considered to have taken place retroactively. Id. at 105-07. A number of other courts have held likewise. See, e.g., Burnett v. Heckler, 756 F.2d 621, 628 n. 4 (8th Cir.1985) (retroactive SSI); Lindsay v. Secy. of Health and Human Services, 612 F.Supp. 366 (D.N.J.1985) (same); Gallo v. Heckler, 600 F.Supp. 1513, 1518-19 (E.D.N.Y.1985) (same); Fitzgerald v. Schweiker, 538 F.Supp. 992, 1002 (D.M.D.1982) (same); see also 51 Fed.Reg. 12325-26 (April 10, 1986) (SSI for purposes of eligibility for medical assistance benefits under the "Pickle Amendment"); cf., Lee v. Schweiker, 739 F.2d 870, 876-77 (3d Cir.1984) (later-received social security benefits considered to determine whether bankruptcy preference occurred in first month of ninety-day period before filing).
 
 
 101
 A number of courts have rejected the argument that the word "received" in the supplemental security income title of the Social Security Act can be limited to money actually received in hand. See, e.g., Robinson v. Bowen, 650 F.Supp. 1495 (S.D.N.Y.), aff'd, 828 F.2d 71 (2d Cir.1987); Lyon v. Bowen, 802 F.2d 794 (5th Cir.1986); Slosek v. Sect'y of Health and Human Services, 674 F.Supp. 944, 948 (D.Mass.1987). The purpose of the statute, not the term itself determines whether a person is considered to have received a benefit for months for which social security benefits are retroactively paid. 42 U.S.C. Sec. 602(a)(24), the section in question in Commonwealth, had the purpose of preventing duplicate payment of SSI and AFDC benefits, while Sec. 2012(r) attempts to define a disabled person for purposes of the FSA. It thus has a health rather than an income focus. I note in addition that in a different context, that of individual eligibility determinations, Sec. 602(a)(24) has received a different interpretation.[8] Gleim v. Commonwealth, Dept. of Public Welfare, 48 Pa.Cmwlth., 356, 409 A.2d 951, 952 (1980) (plaintiff "received SSI benefits for the entire period between April 8, 1978 and August 9, 1978, although official notice was not received and payments were not paid until August 9, 1978. Therefore, under the plain language of the statute, [plaintiff] became a recipient at that date which SSA found him to be eligible, April 8, 1978").
 
 
 102
 The fact that we have been asked to interpret the word "receives" in a given case obviously does not mean, as the Secretary seems to suggest, that the word will have the same meaning in every case thereafter.[9]
 
 
 103
 I also note that the Secretary's present interpretation of "receives," that is, receives means receives at the date of the disability determination, is not the same as the definition accepted by us in Commonwealth. This fact provides added evidence that Commonwealth does not control this case.
 
 III. Congressional Purpose
 
 104
 Even when Congress has not expressed its opinion on the precise word being interpreted, the purpose of the legislation may be an important guide in determining the correct interpretation.
 
 
 105
 It seems clear that the Supreme Court in Chevron did not intend that legislative purpose could never be helpful in shedding light on legislative language. See, e.g., Bob Jones Univ. v. United States, 461 U.S. 574, 602-04, 103 S.Ct. 2017, 2034-35, 76 L.Ed.2d 157 (1983) (holding that "fundamental, overriding interest [of government] in eradicating racial discrimination" outweighed burden of denying tax benefits); United Steelworkers of America v. Weber, 443 U.S. 193, 203, 99 S.Ct. 2721, 2727, 61 L.Ed.2d 480 (1979) (stating Congress' primary goal in prohibiting racial discrimination in employment in Title VII was to open employment opportunities which traditionally had been closed to blacks).
 
 
 106
 The Chevron court itself relied in part on the purposes of the legislation it was examining in determining the meaning of the ambiguous term at issue in that case. 467 U.S. at 861, 863, 104 S.Ct. at 2790, 2792. Those purposes pointed in different directions and thus were not helpful. 467 U.S. at 865, 104 S.Ct. at 2793. That is not so in the case before us. In a later case, Chemical Manufacturers Assn. v. Natural Resources Defence Council, Inc., 470 U.S. 116, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985), the Court confirmed that the analysis of statutory purpose was part of the Chevron analysis. As part of its analysis, the Court determined that the agency action in question did not "threaten to frustrate the goals and operation of the statutory scheme set up by Congress." Id. at 129-30, 105 S.Ct. at 1109-10. The effort to examine an agency interpretation for harmony with statutory purpose (not merely specific intent) has a long history in Supreme Court jurisprudence.[10]
 
 
 107
 We have, since Chevron, continued to hold that statutory purpose must be examined. In Robinson v. Block, 869 F.2d 202 (3d Cir.1989), for instance, also a food stamp case, we held that:
 
 
 108
 As a reviewing court, we must reject an administrative construction of a statute if it is "inconsistent with the statutory mandate or frustrate[s] the policy that Congress sought to implement." Securities Industry Association v. Board of Governors of the Federal Reserve System, 468 U.S. 137, 143, 104 S.Ct. 2979, 2982, 82 L.Ed.2d 107 (1984) (quoting FEC v. Democratic Senatorial Campaign Committee, 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981)). See also Morton v. Ruiz, 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974) ("In order for an agency interpretation to be granted deference, it must be consistent with the congressional purpose.").
 
 
 109
 Id. at 213.
 
 
 110
 Even if particular deference is owed to an agency because of its expertise on the relevant question, expertise which in this case is lacking, we "must not" rubber-stamp "administrative decisions that are inconsistent with a statutory mandate or that frustrate a statutory policy." U.S. Dept. of Navy v. F.L.R.A., 840 F.2d 1131, 1134 (3d Cir.), cert. dismissed, --- U.S. ----, 109 S.Ct. 632, 102 L.Ed.2d 170 (1988); (citing to Bureau of Alcohol, Tobacco and Firearms, 464 U.S. 89, 96-98, 104 S.Ct. 439, 443-44, 78 L.Ed.2d 195 (1983)).
 
 
 111
 In Lynch v. Lyng, 872 F.2d 718 (6th Cir.1989), the Court of Appeals for the Sixth Circuit recently refused to accord deference to the Secretary's interpretation of food stamp legislation, which interpretation would have denied disabled food stamp recipients retroactive food stamp benefits. While the interpretation involved ambiguity in the statute and was, as the court put it, "a close case," the court nonetheless concluded that "where we find that the language of the statute, the broader purposes, and the legislative history argue against the Secretary's position, we are not compelled to defer to his interpretation." Lynch, at 724. See also Murray v. Lyng, 854 F.2d 303, 305 (8th Cir.1988) (finding deference inappropriate in striking down USDA's regulations counting foster care assistance as income to food stamp households); Foster v. Celani, 849 F.2d 91, 92 (2d Cir.1988) (same).
 
 
 112
 Regulations that contravene congressional intent cannot be upheld. See Southeastern Community College v. Davis, 442 U.S. 397, 411, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979). In Summy v. Schweiker, 688 F.2d 1233 (9th Cir.1982), the court faced a "choice ... simply between the interpretation of the Secretary, to which we should afford substantial weight and that which we believe best advances the purposes of the SSI program. The latter is our choice." Id. at 1235. Under the facts of the case before us, a choice in favor of the benevolent purposes of the Act, and in particular, Congress's special concern for the plight of the low-income disabled, is equally appropriate.
 
 
 113
 Congress has emphasized the humanitarian purposes which undergird the food stamp law by beginning that law with a declaration of Congressional policy:
 
 
 114
 It is declared to be the policy of Congress, in order to promote the general welfare, to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households. Congress finds that the limited food purchasing power of low-income households contributes to hunger and malnutrition among members of such households. Congress further finds that increased utilization of food in establishing and maintaining adequate national levels of nutrition will promote the distribution in a beneficial manner of the Nation's agricultural abundance and will strengthen the Nation's agricultural economy, as well as result in more orderly marketing and distribution of foods. To alleviate such hunger and malnutrition, a food stamp program is herein authorized which will permit low-income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation.
 
 
 115
 7 U.S.C. Sec. 2011 (emphasis added). This declaration focuses on the humanitarian concern of Congress that low-income households have increased food purchasing power and on the goal of increasing food purchases with the resultant benefits for the nation's agricultural economy. Neither of these goals is enhanced by the Secretary's interpretation; both are enhanced by the interpretation suggested by West.
 
 
 116
 In this case the Secretary's interpretation does not comport with the purposes animating the statutory provisions of food stamps for the low-income disabled. The Secretary's interpretation is inconsistent with the policies articulated by Congress which indicate that Congress wants disabled persons to receive food stamps for the periods when they are disabled. The Senate Agriculture, Nutrition and Forestry Committee, for instance, in its report on the shelter expense and medical and dental expense deductions for the elderly and disabled in the Food Stamp Act of 1977, explained:
 
 
 117
 Many of the households are faced with disproportionately high medical and shelter costs and have few options for reducing them. Although the absolute number of households containing an elderly or disabled person ... appears to be small, the households involved are placed in a situation that is totally untenable. With their limited resources, they must choose between purchasing food and paying their medical and shelter bills. It is too often the case that they choose paying their medical and shelter bills. Inadequate nutrition can contribute to medical problems of the elderly and the disabled and thereby increase their cost of medical care.
 
 
 118
 S.Rep. 96-236, at 17, reprinted at 1979 U.S.Code Cong. & Admin.News 939, 955.
 
 
 119
 Then Senate majority leader, Robert Dole, in 1982 commented on the Food Stamp Program Provisions in the Budget Reconciliation Bill which preserved the special status of the elderly and disabled:
 
 
 120
 The Senator from Kansas and most members of the Agriculture Committee were concerned about savings proposals recommended by the administration and included in S. 2352, which would have cut benefits from nearly all participants, including the elderly and disabled
 
 
 121
 ....
 
 
 122
 When faced with various options for implementing benefit reductions in the food stamp program, the committee proceeded with a special sensitivity of benefits for elderly and disabled households. Concern over the sufficiency of benefits for elderly and disabled persons was a common theme expressed by State and local food stamp administrators across the country in their responses to Chairman Helms' request for their views on program reauthorization. While generally supporting a tightening of the program in other areas, these letters emphasized the inability of elderly and disabled households to augment their income like other households. The committee wisely defeated proposals that would have had a disproportionate effect upon the elderly and disabled--such as eliminating the minimum benefit and counting energy assistance as income against food stamp benefits.
 
 
 123
 128 Cong.Rec.S. 9914 (daily ed. Aug. 5, 1982). See also H.Rep. 97-687, at 45 (Aug. 2, 1982) 1982 U.S.Code Cong. & Admin.News, 1641 (report on Food and Agriculture Reconciliation Act explaining provision allowing for special beneficial cost of living adjustment rules for elderly and disabled food stamp recipients).
 
 
 124
 Congress clearly is not opposed to the issuance of retroactive food stamp benefits where appropriate. In the Hunger Prevention Act Congress strengthened the Food Stamp Act's provisions for correcting underissuances. Pub.L. 100-435, Sec. 320. The Senate Agriculture Committee explained that this provision reflected its strong concern "that eligible households receive the full measure of food stamps to which they are entitled because of their circumstances," through retroactive benefits, if necessary. S.Rep. 100-397, at 25, 1988 U.S.Code Cong. & Admin.News at 2263. Similarly, Sen. Harkin, Chairman of the Nutrition Subcommittee, overseeing the food stamp program, stated that "[w]e feel strongly about the importance of providing restored benefits when they are due." 134 Cong.Rec. S11746 (daily ed. August 11, 1988).
 
 
 125
 In commenting on provisions of the Hunger Prevention Act of 1988, the Senate Agriculture Committee opined that "getting retroactive benefits late is better than not getting them at all." S.Rep. 100-397, at 29, 1988 U.S.Code Cong. & Admin.News at 2267. The Act expanded the definition of "disabled" persons to, inter alia, include those receiving state interim assistance pending SSI determinations. This change was apparently seen by the Committee as expediting food stamp benefits to the disabled since they would no longer have to wait for retroactive benefits.
 
 
 126
 The Social Security Administration often takes months or years to approve applications for disability payments. Although getting retroactive benefits late is better than not getting them at all, several states have recognized that getting benefits on a current basis does a better job of meeting disabled people's needs with interim assistance or disability-based Medicaid. In very much the same spirit, the Committee wishes to recognize these earlier decisions as meeting the definition of disability.
 
 
 127
 S.Rep. 100-397, at 29, 30, 1988 U.S.Code Cong. & Admin.News at 2267, 2268 (emphasis added). Senator Leahy, Chairman of the Senate Agriculture Committee, asserted that this provision "reflects our long-standing concern that the disabled among us be fully protected." 134 Cong.Rec. S11743 (daily ed. August 11, 1988). Senator Harkin, Chairman of the Nutrition Subcommittee that wrote the Senate bill, explained that the change was intended to help "people ... likely to get SSI eventually [to] receive recognition for their actual conditions more promptly." 134 Cong.Rec. S11746 (daily ed. August 11, 1988).
 
 
 128
 The Secretary's interpretation of the statute undermines the straightforward humanitarian concern of Congress that the disabled receive food stamps.[11] There is nothing in the legislative history which indicates that Congress intended that because the SSA mistakenly denies or delays benefits to those who are in fact eligible that they should, because of those errors on SSA's part, lose the benefit of their food stamps.[12] It seems clear that Congress did not intend the disabled to suffer additional burdens because of administrative problems or error at SSA.[13]
 
 IV.
 
 129
 Because of the determination I would make on statutory interpretation grounds, I need not tarry long in discussing the Rehabilitation Act and due process claims of West with regard to Class A.
 
 A. Section 504 Rehabilitation Act
 
 130
 Section 504 of the Rehabilitation Act of 1973 provides that "[n]o otherwise qualified individual with handicaps in the United States, ... shall, solely by reason of his handicap, be excluded from the participation in, denied the benefits of, or be subjected to discrimination under any program ... receiving Federal financial assistance or under any program ... conducted by an Executive agency." 29 U.S.C. Sec. 794. West argues that the Secretary's denial of retroactive recognition of appellants' disabilities violates Sec. 504.[14]
 
 
 131
 In Strathie v. Dept. of Transportation, 716 F.2d 227, 230 (3d Cir.1983), we determined that in order to establish a Sec. 504 claim,
 
 
 132
 a plaintiff must prove (1) that he is a "handicapped individual" under the Act, (2) that he is "otherwise qualified" for the position sought, (3) that he was excluded from the position sought solely by reason of his handicap, and (4) that the program or activity in question receives federal financial assistance.
 
 
 133
 Appellees apparently do not contest the fact that West meets the first, second and fourth of these criteria. Brief of Secretary at 26; Brief of Pennsylvania Dept. of Public Welfare at 19.
 
 
 134
 With regard to the third element, West makes a strong argument that because of the Secretary's interpretation of the statute, not the statutory scheme itself, solely by virtue of their disability, Class A plaintiffs are denied retroactive food stamp calculations while the elderly and the non-disabled are allowed retroactive recalculation of their benefits.[15] Because the majority only briefly addresses this issue and because West's stronger argument is dispositive for me, I do not address this argument now.
 
 B. Due Process
 
 135
 West also asserts a due process claim. In order to establish a due process claim West must demonstrate first that the Food Stamp Act confers on the disabled a property interest and, second, that they are denied the property that is their due. See Logan v. Zimmerman Brush Co., 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982). Those who are in fact disabled may well have a property interest in receiving food stamps for their disability determination period. If that is so, the Secretary's interpretation of the statute certainly denies the disabled this property.
 
 
 136
 West does "not challenge the propriety of delegating fact-finding functions to slower governmental agencies if the procedure ultimately gave claimants the opportunity for full vindication of their rights." However, she asserts that by refusing to recognize the disabled's disability retroactively, the Secretary denies the disabled any meaningful opportunity to establish that they are entitled to receive food stamps for the disability determination period. See Logan, 455 U.S. 422, 102 S.Ct. 1148 (no opportunity to prove entitlement under states civil rights law); Zablocki v. Redhail, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) (no opportunity to prove that children would not become public charges); U.S. Department of Agriculture v. Murry, 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973) (no opportunity to prove that tax dependent was not in fact receiving support from parents). Again, the majority only briefly addresses this issue and there is no compelling reason, given by analysis, for me to address it at this juncture.
 
 V.
 
 137
 I would hold that the district court's grant of summary judgment to the Secretary on Class A's claim was incorrect and should be reversed. The Secretary's changing interpretation of the word "receives" in Sec. 2012(r) is due little deference and does not comport with the legislative purpose of the FSA. I would reverse on this issue and remand to the district court to determine the date from which any restored food stamp benefits should be provided and for a resolution of the information sharing issue as requested by the Class A plaintiffs.
 
 
 
 [1]
 Throughout this opinion we have used the following acronyms: AFDC--Aid to Families with Dependant Children; SSI Supplemental Security Income; SSA--Social Security Administration; USDA--United States Department of Agriculture; and HHS--United States Department of Health and Human Services. Other acronyms and abbreviations will be defined in the text where they are used
 
 
 [2]
 West filed her original complaint with the district court in August, 1984, seeking review of HHS's determination that she did not qualify for SSI disability benefits. The district court reversed HHS's determination and ordered that West should receive disability benefits. As will be discussed in some detail later in this opinion, her eligibility for food stamps is contingent upon her receipt of disability benefits
 
 
 [3]
 7 U.S.C. Sec. 2012(r) reads as follows:
 "Elderly or disabled member" means a member of a household who--
 (1) is sixty years of age or older;
 (2) receives supplemental security income benefits under title XVI of the Social Security Act (42 U.S.C. 1381 et seq.), federally or State administered supplemental benefits of the type described in section 1616(a) of the Social Security Act [42 U.S.C. Sec. 1382E(A) ] if the Secretary determines that such benefits are conditioned on meeting the disability or blindness criteria used under title XVI of the Social Security Act [42 U.S.C. Sec. 1381 et seq.], or federally or State administered supplemental benefits of the type described in section 212(a) of Public law 93-66 (42 U.S.C. 1382 note);
 (3) receives disability or blindness payments under title I, II, X, XIV, or XVI of the Social Security Act [42 U.S.C. Secs. 301 et seq., 401 et seq., 1201 et seq., 1351 et seq., 1381 et seq.] or receives disability retirement benefits from a governmental agency because of a disability considered permanent under section 221(i) of the Social Security Act (42 U.S.C. 421(I)).... (emphasis added)
 
 
 [4]
 42 U.S.C. Sec. 602(a)(24) sets forth that a state's AFDC program must:
 provide that if an individual is receiving benefits under subchapter XVI [SSI disability benefits] of this chapter or his costs in a foster family home or child-care institution are covered by the foster care maintenance payments being made to his or her minor parent as provided in section 675(4)(B) of this title, then, for the period for which such benefits are received or such costs are so covered, such individual shall not be regarded as a member of a family for purposes of determining the amount of the benefits of the family under this subchapter and his income and resources shall not be counted as income and resources of a family under this subchapter....
 (emphasis added)
 
 
 [5]
 West argues that the unreasonableness of USDA's interpretation is further underscored by U.S.C. Secs. 2020(e)(11) and 2023(b). Both of these provisions provide for retroactive food stamps when food stamps have been "wrongfully withheld" or "wrongfully denied." The restoration of these benefits is limited to one year. One court has read these statutory provisions as requiring retroactive payments of lost benefits. Klaips v. Bergland, 715 F.2d 477, 484 (10th Cir.1983) ("In fact, the Food Stamp Act itself requires such restoration of benefits both by the courts,, 7 U.S.C. Sec. 2023(b), and by state agencies which administer the food stamp program, 7 U.S.C. Sec. 2020(e)(11).") West does not argue that these provisions are directly controlling, but indicates that they should guide the proper interpretation of the word "receives." We do not agree. The terms of the statute dictate that eligibility for disability food stamp preferences is contingent upon a determination that the applicant is entitled to disability benefits. Thus, prior to such a disability determination, no food stamps could have been "wrongfully withheld" or "wrongfully denied."
 
 
 [6]
 West has directed our attention to a recent opinion of the Sixth Circuit. In Lynch v. Lyng, 872 F.2d 718 (1989), the Sixth Circuit held that the Secretary of Agriculture's regulations implementing the definition of the term "disabled" contained in 7 U.S.C. Sec. 2012(r), could not be upheld because the regulations impermissibly varied from the statute. The regulations established an effective date for the recalculation of benefits, but that date extended several months beyond the explicit effective date contained in the statute. The effect of the holding in Lynch, therefore, was to award retroactive benefits to the members of the plaintiff's class
 While the Lynch case does award retroactive food stamp benefits, neither the analysis nor the holding of Lynch has any bearing on the instant case. Lynch, as noted, is primarily concerned with the variance between the effective date of the statute and the effective date of the implementing regulations. On the other hand, in this case we address the issue of whether the Secretary must award retroactive benefits for the period of time that an application is under consideration. This issue calls for us to address the meaning of Sec. 2012(r), not its effective date. Indeed, the effective dates of the regulations and the statutes relevant to the instant appeal have not been challenged.
 
 
 [7]
 West also argues that because SSA treats certain disabilities like mental illness, more stringently than other disabilities, the effect of disabled applicants. The district court rejected this argument as an argument applicable to a subclass of Class A members. In doing so, it is noted that West had consistently sought relief for all members of Class A without reference to subclasses. We agree with the district court's reasoning and holding on this point
 
 
 [8]
 Apparently the policy behind flat rate reimbursements was designed to encourage residents to conserve energy so that if a resident spends less than the flat rate reimbursement, the difference may be pocketed. However, a resident residing in an apartment with poor insulation, or a more expensive than average heating system, may end up losing money under this system
 
 
 [9]
 West stated that her rent approximates $53 per month. That rental indicates a monthly adjusted gross income of about $177. She has been assigned a utility reimbursement of $152 per month even though her actual utility bills range up to $154 per month. Under the statute, therefore, West pays no rent and receives a utility rebate check each month in the amount of $99 ($152 minus $53). It is this $99 per month which USDA now credits to her as additional income in calculating her food stamp benefits
 Group Metering
Utility Costs 0 (included in rent).
Rent $30.
 __________
Total out of pocket expense for Rent k Utilities = $30.
Individual Metering
Utility Costs $50 (The resident pays this with his/her own
 money).
Rent 0 (Because public housing rent includes
 utilities and the total of the two cannot
 exceed 30% of a tenant's income).
Utility (Average utility costs of residents
Reimbursement $50 citywide, this sum is credited against
 resident's rent).
Utility Rebate $20 (Difference between Utility Reimbursement
 and the maximum rent k utilities a
 resident can be charged, i.e., $50 - $30 =
 20. This "utility rebate" is received by
 resident and added to adjusted gross
 income for purposes of food stamp benefit
 calculation by USDA).[9]
9 West stated that her rent approximates $53 per month. That rental
indicatees a monthly adjusted gross income of about $177. She has been
assignedd a utility reimbursement of $152 per month even though her actual
utility bills range up to $154 per month. Under the statute, therefore, West
pays no rent and receives a utility rebate check each month in the amount of
$99 ($152 minus $53). It is this $99 per month which USDA now credits to her
as additional income in calculating her food stamp benefits.
 __________
 
 
 [10]
 Even if one accepts USDA's interpretation, that the payments must be made under a federal statute which has the purpose of providing energy assistance, we believe that USDA's interpretation is still untenable. USDA concedes that the purpose of the Housing Act is to provide decent and affordable housing for low income families. To further that end, utility costs have always been included as part of a resident's rent. Obviously, if a resident does not have heat, hot water, and electricity, he or she cannot be said to have decent and affordable housing. Thus, common sense, logic, and reason dictate that the purpose of the Housing Act was to do more than just provide minimal housing, and that one of the purposes of the Act was to provide low income residents with utilities or "energy assistance."
 
 
 [11]
 West puts forward a number of other bases for reversing the district court. Because of our disposition above, we need not address these other arguments
 
 
 [1]
 See, e.g., Motor Vehicle Manufacturers Assoc. v. State Farm Mutual Automobile Ins. Co., 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); CBS, Inc. v. FCC, 453 U.S. 367, 382, 101 S.Ct. 2813, 2823, 69 L.Ed.2d 706 (1981); EEOC v. Associated Dry Goods Corp., 449 U.S. 590, 600 n. 17, 101 S.Ct. 817, 823 n. 17, 66 L.Ed.2d 762 (1981); Piper v. Chris-Craft Indus., Inc., 430 U.S. 1, 41 n. 27, 97 S.Ct. 926, 949 n. 27, 51 L.Ed.2d 124 (1977); General Elec. Co. v. Gilbert, 429 U.S. 125, 142, 97 S.Ct. 401, 411, 50 L.Ed.2d 343 (1978); United Housing Found., Inc. v. Forman, 421 U.S. 837, 858 n. 25, 95 S.Ct. 2051, 2063 n. 25, 44 L.Ed.2d 621 (1975); Morton v. Ruiz, 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974); Federal Maritime Bd. v. Isbrandtsen, 356 U.S. 481, 499-500, 78 S.Ct. 851, 862-63, 2 L.Ed.2d 926 (1958); Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944); Burnet v. Chicago Portrait Co., 285 U.S. 1, 16, 52 S.Ct. 275, 281, 76 L.Ed. 587 (1932); United States v. Missouri P.R. Co., 278 U.S. 269, 280, 49 S.Ct. 133, 137, 73 L.Ed. 322 (1929); Merritt v. Cameron, 137 U.S. 542, 552, 11 S.Ct. 174, 178, 34 L.Ed. 772 (1890)
 
 
 [2]
 In Lynch the Sixth Circuit found that retroactive food stamps were a normal part of the food stamp program
 While there is something inherently illogical in the awarding of retroactive food stamps--one who has been denied basic subsistence for one year is not really made whole by being given one year's worth of food in a lump sum at the end of the year--such a procedure is not at all foreign to the food stamp program. Retroactive benefits are frequently paid when benefits are improperly terminated for a period of time. More significantly, Secretary Lyng has given retroactive effect to many of the amendments contained in Title XV of the Act. See, e.g., 51 Fed.Reg. 28,196 (1986) (to be codified at 7 C.F.R. Secs. 272.1(g), 273.2(j)); 52 Fed.Reg. 5,434 (Feb. 23, 1987). While we agree with the Secretary that the fact that these amendments were given retroactive effect is not proof that section 1504 must be given retroactive effect, we note these regulations only to demonstrate that giving amendments retroactive effect is neither novel nor an anathema to the basic purposes of the food stamp program. Rather, the Secretary makes benefits retroactive when the demands of fairness require it.
 Lynch, at 723-724.
 
 
 [3]
 The Secretary's policy in allowing the disabled which meet Sec. 2014(a) requirements to receive retroactive benefits for the period in which their disability claim was being reviewed is a case in which the Secretary has interpreted certain 2012(r) disabled as being eligible to receive retroactive food stamp benefits. It is not a separate and distinct determination unrelated to 2012(r). As the Secretary himself describes it in his brief, the Sec. 2014(a) retroactivity is an "exception" to his general 2012(r) interpretation. Secretary's Brief at 6. Section 2012(r) appears in the definitional section of the food stamp law and is a definition to be used in interpreting all references to the "disabled" or "elderly" under the food stamp law. Those disabled covered by Sec. 2014(a) are not, consequently, different persons from those defined in 2012(r). The 2014(a) disabled are merely a subgroup of 2012(r) disabled, who live in households comprised entirely of disabled persons. To qualify for the various preferences provided the disabled in the food stamp law the 2014(a) disabled must meet the general 2012(r) definition of "disabled." The Food Stamp Act provides a number of these special preferences for disabled persons who meet the 2012(r) definition. Only elderly and disabled people may claim deductions for high medical expenses in computing the income and benefit amounts. 7 U.S.C. Sec. 2014(c). Only elderly and disabled people may deduct the full amount of high shelter costs they may experience. Id. Only elderly and disabled people are entitled to receive food stamps independently of siblings and adult children with whom they may be living. 7 U.S.C. Sec. 2012(i). Disabled people may receive food stamps without regard to the value of any vehicle they own. 7 U.S.C. Sec. 2014(g)
 
 
 [4]
 Courts have often interpreted social security benefits as being "received" retroactively. See, e.g., Wheeler v. Heckler, 787 F.2d 101 (3d Cir.1986); Burnett v. Heckler, 756 F.2d 621, 628 n. 4 (8th Cir.1985); Lindsay v. Secy. of Health and Human Services, 612 F.Supp. 366 (D.N.J.1985); Gallo v. Heckler, 600 F.Supp. 1513, 1518-19 (E.D.N.Y.1985); Fitzgerald v. Schweiker, 538 F.Supp. 992, 1002 (D.Md.1982)
 
 
 [5]
 There is also a line of cases which indicate that when benefits under a humanitarian (or remedial) statute are at issue, ambiguities in interpretation of the statute will be resolved in favor of the intended beneficiaries, despite the presence of a contrary agency interpretation. See, e.g., A.H. Phillips v. Walling, 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095 (1945); Peyton v. Rowe, 391 U.S. 54, 65, 88 S.Ct. 1549, 1555, 20 L.Ed.2d 426 (1968); Brennan v. Keyser, 507 F.2d 472, 477 (9th Cir.1974), cert. denied, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975); Alaska Public Easement Defense Fund v. Andrus, 435 F.Supp. 664, 671 (D.Alaska 1977)
 
 
 [6]
 As Judge Weis has explained:
 The APA was enacted after years of study and negotiations on various legislative proposals. The Act reflects congressional disapproval of agency activity which seemed to be exempt from checks, balances, and controls. Complaints about arbitrary administrative action were rife, and in response Congress enacted the APA to reorder comprehensively the administrative scheme and to clarify the roles of the legislative, executive, and judicial entities.
 In leading discussion on the Senate floor on March 12, 1946, Senator McCarran described the legislation as "a bill of rights for hundreds of thousands of Americans whose affairs are controlled or regulated in one way or another by agencies of the Federal Government." Referring to the provisions for judicial review of agency actions, he said
 I desire to emphasize the fifth type of provisions, namely, provisions for judicial review, because it is something in which the American public has been and is much concerned, harkening back, if we may, to the Constitution of the United States, which sets up the judicial branch of the Government for the redress for human wrongs and for the enforcement of human rights.
 A similar approach was taken in the House by Representative Walter, Chairman of the Subcommittee on Administrative Law. He explained, "[s]ubsection (e) of section 10 [presently section 706] requires courts to determine independently all relevant questions of law, including the interpretation of constitutional or statutory provisions and the determination of the meaning or applicability of any agency action." The report of the Senate Judiciary Committee further emphasized that "questions of law are for courts rather than agencies to decide in the last analysis" and that "enforcement of the bill, by the independent judicial interpretation and application of its terms, is a function which is clearly conferred upon the court in the final analysis." To dispel any doubt about congressional intention in this respect, the report continued, "[i]t will thus be the duty of reviewing courts to prevent avoidance of the requirements of the bill by any manner or form of indirection, and to determine the meaning of the words and phrases used."
 Weis, supra typescript p. 5, at 305-06 (footnotes omitted).
 
 
 [7]
 See, e.g., SEC v. Sloan, 436 U.S. 103, 118, 98 S.Ct. 1702, 1711, 56 L.Ed.2d 148 (1978); Piper v. Chris-Craft Indus., Inc., 430 U.S. 1, 41 n. 27, 97 S.Ct. 926, 949 n. 27, 51 L.Ed.2d 124 (1977); FMC v. Seatrain Lines, Inc., 411 U.S. 726, 745-46, 93 S.Ct. 1773, 1784-85, 36 L.Ed.2d 620 (1973); Zuber v. Allen, 396 U.S. 168, 193, 90 S.Ct. 314, 328, 24 L.Ed.2d 345 (1969); Volkswagenwerk Aktiengesellschaft v. FMC, 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968); FTC v. Colgate-Palmolive Co., 380 U.S. 374, 385, 85 S.Ct. 1035, 1042, 13 L.Ed.2d 904 (1965); Fox v. Standard Oil Co., 294 U.S. 87, 97, 55 S.Ct. 333, 337, 79 L.Ed. 780 (1935)
 
 
 [8]
 In this regard I also note that a word is a fragile vessel for its meaning whose changing content is often determined by its context
 If words had absolute and constant referents, it might be possible to discover contractual intention in the words themselves and in the manner in which they were arranged. Words, however, do not have absolute and constant referents ... The meaning of particular words or groups of words varies with the "... verbal context and surrounding circumstances and purposes in view of the linguistic education and experience of their users and their hearers or readers (not excluding judges) ... A word has no meaning apart from these factors; much less does it have an objective meaning, one true meaning."
 Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Ry. Co., 69 Cal.2d 33, 69 Cal.Rptr. 561, 564-65, 442 P.2d 641, 644-45 (1968) (quoting Corbin, The Interpretation of Words and the Parol Evidence Rule, 50 Cornell L.Q. 161, 187 (1965)).
 
 
 [9]
 We have often been asked to interpret the word "receives" and have emerged with different meanings in different contexts. See, e.g., Gaines v. Amalgamated Insur. Fund, 753 F.2d 288, 291 (3d Cir.1985); United States v. Norton, 717 F.2d 767, 774 (3d Cir.1983); United States v. Uzzolino, 651 F.2d 207, 212 (3d Cir.), cert. denied, 454 U.S. 865, 102 S.Ct. 327, 70 L.Ed.2d 166 (1981); United States v. Thompson, 420 F.2d 536, 543 (3d Cir.1970); Hallowell v. Commissioner, 160 F.2d 536, 538 (3d Cir.1947)
 
 
 [10]
 See, e.g., E.E.O.C. v. Commercial Office Products Co., 486 U.S. 107, 108 S.Ct. 1666, 1671-75, 100 L.Ed.2d 96 (1988) (examining legislative history of legislation at issue and finding agency's interpretation "far more consistent with the purposes of the Act than respondent's contrary construction" and "plainly at variance with the policy of the legislation as a whole"); K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 108 S.Ct. 1811, 1820-22, 100 L.Ed.2d 313 (1988) (examining purpose of legislation in question and finding agency interpretation consistent with that purpose, while challenger's position even if "within the letter of the statute [was] yet not within the statute, because not within its spirit, nor within the intention of its makers"); I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 445-46, 107 S.Ct. 1207, 1220-21, 94 L.Ed.2d 434 (1987) (rejecting government's contention that deference was required and deciding that interpretation issue was "a pure question of statutory construction for the courts to decide"); Board of Governors v. First Lincolnwood Corp., 439 U.S. 234, 251, 99 S.Ct. 505, 514, 58 L.Ed.2d 484 (1978) (deference appropriate when agency interpretation accords with "well-established congressional goals"); Morton v. Ruiz, 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974) ("[i]n order for an agency interpretation to be granted deference, it must be consistent with the congressional purpose"); CBS, Inc. v. Democratic Nat. Comm., 412 U.S. 94, 122, 93 S.Ct. 2080, 2096, 36 L.Ed.2d 772 (1973) (court must engage in "careful evaluation of the [agency's] reasoning in light of the policies embodied by Congress in the ... Act"); Zuber v. Allen, 396 U.S. 168, 192, 90 S.Ct. 314, 327, 24 L.Ed.2d 345 (1969) (court should defer to agency interpretation only if this position "enhances the general purposes and policies underlying the legislation")
 
 
 [11]
 The provision of sustenance for the disabled has deep roots in human thought. As long ago as ancient Greece, Aristotle recognized this right. "[F]or there is a law that anyone with property of less than three minae who suffers from a physical disability which prevents his undertaking any employment should come before the [council], and if his claim is approved he should receive two obols a day sustenance from public funds." Aristotle, The Constitution of Athens, in Aristotle and Xenophon on Democracy and Oligarchy 190 (J. Moore trans. 1975)
 
 
 [12]
 The district court itself took judicial notice of a tendency we also have noticed "that the SSA has demonstrated predilections for both painfully slow and outrageously arbitrary adjudications ..." See Bowen v. Yuckert, 482 U.S. 137, 156, 107 S.Ct. 2287, 2298, 96 L.Ed.2d 119 (1987) (concurring opinion of O'Connor, J., and Stevens, J.) ("all regional Federal Courts of Appeals have either enjoined the Secretary's use of the Step Two regulation [severe impairment] or have imposed a narrowing construction upon it.")
 We have often had occasion to examine and note the gross errors and delays in disability determinations by SSA, many of them delaying benefits for many more years than the two suffered by Ms. West. See, e.g., Woody v. Secretary of Health and Human Services, 859 F.2d 1156 (3d Cir.1988) (directing that disability benefits be paid after more than eight years of administrative and district court proceedings); Podedworny v. Harris, 745 F.2d 210 (3d Cir.1984) (directing award of benefits after more than five years of proceedings because Secretary's denial of benefits not supported by substantial evidence); Cannuni v. Schweiker, 740 F.2d 260 (3d Cir.1984) (social security disability claim of plaintiff subjected "to litigation on an unjustified claim over a period of some four years.... [S]urely someone in the bureaucracy could have taken the time to take a serious look at this case and cry, 'basta!' (enough!)"); Wier on Behalf of Wier v. Heckler, 734 F.2d 955 (3d Cir.1984) ("Although [plaintiff] was only eleven years old when his application for benefits was made by his mother, he will be well past eighteen, at which time he becomes subject to a new set of regulations, when his case is finally adjudicated properly"); id. at 964 (Hunter, J., concurring) (the effort to get benefits "has gone on much too long"); Coulter v. Weinberger, 527 F.2d 224 (3d Cir.1975) (plaintiff denied disability benefits for more than sixteen years due to "clerical errors and incomplete evaluations" despite fact that he suffered from, inter alia, tuberculosis, idiopathic osteoporosis, a disability in his left hand which left it non-functional, schizophrenia requiring electroshock therapy, collapsed vertebrae; plaintiff had a rib, part of a lung and a spinal tumor removed, had an artificial hip join implanted, and was emaciated, stopped and had great difficulty in walking); see also Podedworny. 745 F.2d at 222 n. 11 (noting that "in 29.4% of 'Disability Final Court Decisions' by district courts, the Secretary's disability determinations were reversed without remand"); Wier, 734 F.2d at 957 ("what troubles us more is the fact that the Secretary so often appears to have wrongfully withheld benefits").
 
 
 [13]
 The district court finds offsetting purposes undergirding the Secretary's interpretation and concludes that the Secretary has struck a compromise which favors reducing costs and easing administrative complexity over helping the needy disabled. There is no indication that Congress intended that the Secretary restrict benefits in order to save money and reduce administrative burdens. As demonstrated above the clear overriding purpose of the statutes' provisions concerning the disabled is to provide benefits to those actually disabled, not to save money and make administration easier at USDA by taking those benefits from the disabled. Furthermore, West is not requesting that food stamp agencies rather than the SSA determine disability; therefore, there is no appreciable increase in administrative complexity
 
 
 [14]
 Another Rehabilitation Act claim raised by West also merits attention but was not pressed by West in the district court. West alleges that a subset of Class A, those with mental disabilities, are discriminated against vis-a-vis those with physical disabilities. The district court took judicial notice of the fact "that the SSA has demonstrated predilections for both painfully slow and outrageously arbitrary adjudications with respect to certain types of disability." The court, however, did not directly confront this argument because West had "not directly challenged the SSA's processing of disability applications." Furthermore West did not press certification of the mentally disabled as a subclass of Class A. The district court thus did not address the claims of the mentally disabled as a subclass of Class A
 
 
 [15]
 This disparity suggests that there has been an equal protection violation. The Supreme Court on a number of occasions has struck down on equal protection grounds regulations or statutes which discriminated against a subgroup of needy people on a basis that the Court decided had no justification. In U.S. Dept. of Agriculture v. Moreno, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973), the court struck down the "unrelated person" provision of the FSA as "wholly without any rational basis." Id. at 538, 93 S.Ct. at 2827. The government provided a superficially rational argument that was rejected by the Court. According to the Court:
 [E]ven if we were to accept as rational the Government's wholly unsubstantiated assumptions concerning the differences between "related" and "unrelated" households, we still could not agree with the Government's conclusion that the denial of essential federal food assistance to all otherwise eligible households containing unrelated members constitutes a rational effort to deal with these concerns.
 Id. at 535-36, 93 S.Ct. at 2826-27 (footnote omitted) (emphasis in original). See also U.S. Dept. of Agriculture v. Murry, 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973) (striking down Sec. 5(6) of the FSA).
 It is interesting to note in this regard that some have suggested that there is, in the American Constitutional system, a fundamental right to food for the destitute. It seems clear that without food, and its corollary, physical survival, all of the other rights embodied in the Constitution lose their meaning. See United Nations, Universal Declaration of Human Rights in Basic Documents on Human Rights 26 (I. Brownlife ed. 1981). ("Everyone has the right to a standard of living adequate for the health and well-being of himself and of his family, including food, clothing, housing and medical care and necessary social services"); L. Tribe, American Constitutional Law 778-79 (1988) ("The day may indeed come when a general doctrine under the fifth and fourteenth amendments recognizes for each individual a constitutional right to a decent level of affirmative governmental protection in meeting the basic human needs of physical survival"); Edelman, The Next Century of Our Constitution: Rethinking Our Duty to the Poor, 39 Hastings L.J. 1, 19-48 (1987); Michelman, The Supreme Court, 1968 Term--Foreword: On Protecting the Poor Through the Fourteenth Amendment, 83 Harv.L.Rev. 7 (1969); Michelman, In Pursuit of Constitutional Welfare Rights: One View of Rawls' Theory of Justice, 121 U.Pa.L.Rev. 962 (1973); Michelman, Welfare Rights in a Constitutional Democracy, 1979 Wash.U.L.Q. 659. But cf. San Antonio Independent School Dist. v. Rodriguez, 411 U.S. 1, 35-37, 93 S.Ct. 1278, 1297-99, 36 L.Ed.2d 16 (1973) ("Empirical examination might well buttress an assumption that the ill-fed, ill-clothed, and ill-housed are among the most ineffective participants in the political process, and that they derive the least enjoyment from the benefits of the First Amendment. If so, appellees' thesis would cast serious doubt on the authority of Dandridge v. Williams, ... and Lindsey v. Normet, ..."); Lindsey v. Normet, 405 U.S. 56, 73-74, 92 S.Ct. 862, 874-75, 31 L.Ed.2d 36 (1972); Dandridge v. Williams, 397 U.S. 471, 487, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970); Price v. Cohen, 715 F.2d 87, 93 (3d Cir.1983), cert. denied 465 U.S. 1032, 104 S.Ct. 1300, 79 L.Ed.2d 700 (1984); Bork, The Impossibility of Finding Welfare Rights in the Constitution, 1979 Wash.U.L.Q. 695.