**Julio CORREA O/B/O Christopher J. CORREA Plaintiff,**

v.

**COMMISSIONER OF SOCIAL SECURITY Defendant.**

No. CIV.A.03–3583 JAG.

United States District Court, D. New Jersey.

July 12, 2004.

Randi S. Mandelbaum, Rutgers School of Law, Newark, NJ, for Plaintiff.

Peter G. O'Malley, Office of the U.S. Attorney, Newark, NJ, for Defendant.

## OPINION

GREENAWAY, District Judge.

### INTRODUCTION

Plaintiff Julio Correa ("Plaintiff"), on behalf of his minor child, Christopher J. Cor-

rea, seeks review of the Commissioner of Social Security's ("Commissioner") decision denying his application for Supplemental Security Income ("SSI") benefits, pursuant to § 405(g) (2000)[1]. Plaintiff argues that the decision is not supported by substantial evidence and should therefore be reversed, or in the alternative, remanded to the Commissioner for reconsideration. This Court finds that this case shall be remanded for further consideration, based on the reasons set forth in this opinion.

### PROCEDURAL HISTORY

Plaintiff filed an application for SSI benefits on September 14, 1999, alleging that his son, Christopher J. Correa, was disabled. (Tr. 94–96.)[2] The SSA denied Plaintiff's application on January 21, 2000. (Tr. 73–75.) Following Plaintiff's request for reconsideration, the denial was affirmed on January 24, 2001. (Tr. 78–80.) Plaintiff sought a hearing, and he appeared before an Administrative Law Judge on September 25, 2001. (Tr. 63–69.) At the hearing, the Administrative Law Judge advised Plaintiff to obtain legal representation, and the hearing was rescheduled. (Tr. 65–69.) On December 18, 2001, Plaintiff had a hearing before Administrative Law Judge Ralph J. Meuhlig ("ALJ Meuhlig") to review the application *de novo*[3]. (Tr. 20–62.) ALJ Meuhlig issued his decision on February 7, 2002, finding that the child was not disabled, and thus Plaintiff was not entitled to Social Security benefits. (Tr. 13–18.) The following is a summary of his findings:

1. The claimant has never engaged in substantial gainful activity (20 C.F.R. § 416.972).

2. The claimant has asthma,[4] which is a severe impairment (20 C.F.R. § 416.924(c)).

3. The subjective allegations of the claimant and his father, while credible, do not substantiate the presence of a disabling impairment.

4. The limitations, resulting from the effects of the claimant's impairment, do not meet, medically equal, or functionally equal the criteria of any of the listed impairments in Appendix 1, Subpart P, Regulations No. 4 (20 C.F.R. § 416.924(d)).

5. The claimant does not have a medically determinable physical or mental impairment that results in marked and severe functional limitations.

1. This section of the Social Security Act ("Act") provides that any individual who was a party to a hearing before the Secretary may commence a civil action within 60 days after the Secretary's final determination. The appropriate forum for this action is the district court of the United States judicial district in which the plaintiff resides. 42 U.S.C. § 405(g).

2. "Tr." refers to said transcript. The Act instructs the Secretary to file, as part of her answer, a certified copy of the transcript of the record, including any evidence used to formulate her conclusion or decision. 42 U.S.C. § 405(g).

3. If the claimant "receives an adverse reconsideration determination, he is entitled to an evidentiary hearing and *de novo* review by an administrative law judge." *Heckler v. Day,* 467 U.S. 104, 106, 104 S.Ct. 2249, 81 L.Ed.2d 88 (1984).

4. Asthma is "a respiratory disorder characterized by recurring episodes of paroxysmal dyspnea, wheezing on expiration/inspiration caused by constriction of the bronchi, coughing, and viscous mucoid bronchial secretions. The episodes may be precipitated by inhalation of allergens or pollutants, infection, cold air, vigorous exercise, or emotional stress." *Mosby's Medical, Nursing & Allied Health Dictionary,* 137 (5th ed. 1998) ("Mosby's").

6. The claimant has not been under a "disability" as defined in the Social Security Act, at any time through the date of this decision (20 C.F.R. § 416.924(d)).

(Tr. 17–18.) Based on these findings, the ALJ concluded that Christopher Correa was not disabled as defined by the SSA, and not entitled to SSI payments.

On February 18, 2002, Plaintiff applied for a review of ALJ Meuhlig's decision before the Social Security Administration Appeals Council ("Appeals Council"). (Tr. 308–313.) On June 13, 2003, the Appeals Council denied the request for review of the ALJ's decision, finding the ALJ's decision to be the final decision of the Commissioner of Social Security in the case. (Tr. 3–5.) Plaintiff subsequently filed the instant action seeking remand of the final decision of the Commissioner, pursuant to 42 U.S.C. § 1383(c)(3).

## STATEMENT OF THE FACTS

### A. Background

The claimant, Christopher Correa, was born on October 7, 1988, and has had asthma since birth. His asthma has affected his ability to engage in physical activities at home and at school, and is triggered by dust, heat, humidity, rodents, and cats. (Tr. 178, 303.) He lives with his sister, his father, and his father's girlfriend (Tr. 30) in a home described as having multiple rodents. (Tr. 248.) His father's girlfriend, Alice Rios, was formerly a nurse's aide, and knows the claimant's daily routine, including the medications he takes to control his asthma and what to do when he is about to have an asthma attack.

(Tr. 303.) Both Rios and the claimant's father state that the claimant has wheezing episodes almost every evening. (Tr. 303.) Since at least early 1999, the claimant has been a regular patient at the Center for Family Health at St. Mary's Hospital. (Tr. 311.)

### B. Medical Evidence

The record indicates that the claimant has received substantial medical attention over the course of three years.

#### 1. Dr. Bonnie Fittleberg

Dr. Fittleberg treated the claimant on September 14, 1999. The doctor reported rales [5] and scattered inspiratory and respiratory wheezing [6]. Dr. Fittleberg also described the child as suffering from asthma since birth, and as living in a home infested with rodents, which continues to exacerbate the child's asthma. The doctor also reported that the claimant was taking Albuterol, an asthma medication, but was not taking other prescribed asthma medications because his father was concerned about their side effects. The doctor reported that she strongly suggested to the father that the claimant take the medications he was advised to take. (Tr. 248.)

On September 14, 1999, Dr. Fittleberg wrote several letters on behalf of the claimant. She described him as having asthma with a history of hospitalizations and intubations. She also stated that the child would require "life long medications." (Tr. 177.) In a second letter in which the doctor addressed the housing director of the claimant's "mice infested home," she

5. Rale is "a common abnormal respiratory sound heard on auscultation of the chest during inspiration, characterized by discontinuous bubbling noises." *Id.* at 1381.

6. Wheeze is a "form of rhonchus, characterized by a high-pitched or low-pitched musical quality. It is caused by a high-velocity flow of air through a narrowed airway and is heard during both inspiration and expiration." *Id.* at 1729–730.

stated that the claimant was diagnosed with asthma at birth, and that his asthma is "severe," requiring "tight medical control with medications and environmental risk factor control." Dr. Fittleberg also stated that if environmental factors such as rodents, animal hair, and dander were not controlled, hospitalization or even death could occur. (Tr. 178.)

### 2. Dr. Jacobs

Dr. Jacobs treated the claimant on September 28, 2000, and June 21, 2001. On September 28, 2000, the doctor reported that the child's lungs were clear and no wheezing had appreciated. Dr. Jacobs also reported that the claimant had not been taking his medications as prescribed. The doctor reported that she spoke to the claimant and his father about the correct way to use the child's asthma medication. (Tr. 236.) On June 21, 2001, Dr. Jacobs reported that the child's lungs were clear. (Tr. 228.) On another visit, the doctor reported that the claimant had been experiencing wheezing in the morning. (Tr. 233.) Upon examination, Dr. Jacobs found wheezes in the claimant's lungs. Again, the doctor reported telling the claimant about the importance of having and taking prescribed medications. (Tr. 233.)

### 3. Center for Family Health

Claimant visited the Center for Family Health (at St. Mary's Hospital) ("CFH") on numerous occasions between September 14, 1999, and June 21, 2001, where he was treated by Drs. Fittleberg and Jacobs, as well as other physicians. On March 19, 1999, he was found to have coughing and wheezing. The medical records also show that the claimant had not used Proventil

for three months. (Tr. 185.) On another visit, claimant was found to have some wheezing in the "lower lung fields." (Tr. 250.) On October 25, 1999, medical records at CFH indicated that the plaintiff's chest was clear. (Tr. 180.)

On January 31, 2000, claimant was described as doing "really well" and as taking his medications. (Tr. 244.) On February 28, 2000, Dr. Perlman, a physician at CFH, reported that the claimant's lungs had a few inspiratory wheezes. (Tr. 243.) The doctor noted that the claimant was taking Flovent in the morning and sometimes during the day, but was not taking his other two inhalers. On another visit to CFH on August 28, 2000, a CFH physician reported that the claimant had no wheezing in his lungs. (Tr. 238.) An evaluation on October 25, 2000 revealed that the claimant had both inspiratory and expiratory wheezing in his lungs. It also reported that the claimant was "still taking med[ications] inappropriately." During the evaluation the plaintiff was re-taught proper medication use. (Tr. 234.)

On a June 8, 2001 visit, the claimant reported that he had no current complaints. (Tr. 231.) On June 21, 2001, the claimant's lungs were described as clear. (Tr. 228.)

### 4. Hospital Visits

On September 18, 1999, the claimant was admitted to St. Mary's Hospital and diagnosed with pneumonia and status asthmaticus [7]. (Tr. 158.) During the claimant's triage assessment, the examiner reported that the claimant had shortness of breath and wheezing bilaterally. (Tr. 161.) It was also reported that the claimant had a nebulizer [8] at home, but ran out of medi-

---

7. Status asthmaticus is "an acute, severe and prolonged asthma attack. It is caused by critically diminished airway diameter result-ing from ongoing bronchospasm, edema, and mucous plugging." Id. at 1538.

8. A nebulizer is a "device for producing a fine spray." Id. at 1086.

cation. (Tr. 163.) The claimant's x-rays revealed that his left lung was clear, but that the right lung had segmental atelectasis.[9] (Tr. 172.) The claimant was discharged from the hospital the next day September 19, 1999. (Exhibit 1F)

On March 8, 2000 the claimant was treated for chest pains at St. Mary's Hospital. The triage nurse reported that the claimant had no wheezing at the present time, but did have a congested upper airway. (Tr. 300.)

### 5. Teacher Questionnaire

The claimant's classroom teacher, Mrs. Boo, completed a Teacher Questionnaire on September 28, 1999. Claimant's classroom teacher indicated that the claimant's academic progress was satisfactory and that he attended regular classes, except for math and language classes for the educationally handicapped. The teacher also reported that the claimant had no problems communicating with peers or adults, performing self-help skills within the school setting, and controlling his behavior. The teacher did report that the child had problems with physical requirements while participating in school activities and has problems breathing. She also reported that the claimant takes medication while at school. (Tr. 132–36.)

### 6. Prescription Records

The claimant was prescribed several corticosteroids[10] and bronchodilators[11] from September 18, 1999 to October 24, 2001. (Tr. 183, 222–225, 277–78.) The bronchodilators the claimant was pre-

scribed include Proventil, Albuterol and Serevent. (Tr. 222–225.) Since March 1999, the claimant has been prescribed numerous corticosteroids, including Azamacort, Prelone, Prednisone, Solumedrol, Flovent, and Advair Diskus. (Tr. 160, 183, 222–25, 277, 278.) Azmacort and Flovent are both inhaled corticosteroids, Solumedrol is an intravenous corticosteroid, and Prelone and Prednisone are both oral corticosteroids.

In 2000, the claimant was prescribed Flovent on five different occasions with each prescription lasting for three or more days. (Tr. 222–23.) In 2001, the claimant was prescribed either Flovent, Nasonex, and Advair Diskus on four different occasions. (Tr. 223–24.)

### 7. Dr. Martin Fechner's Testimony: Expert Opinion

Dr. Martin Fechner, an internist who did not examine the claimant, but who has some experience with asthma in adolescents, testified at the claimant's December 18, 2001, hearing. After examining records up until the end of 2000, Dr. Fechner stated that the fact that the claimant was not taking his medication correctly was meaningful, because "the most important thing in asthma is to take medication." (Tr. 34.) He then noted that in the listing for adults, the claimant must have one hospital visit every two months to be considered disabled: he noted that the claimant did not meet this requirement. The doctor then stated that he did not find evidence in the claimant's medical reports

---

**9.** Atelectasis is "an abnormal condition characterized by the collapse of the alveoli, preventing the respiratory exchange of carbon dioxide and oxygen." *Id.* at 141.

**10.** A corticosteroid is "any one of the natural or synthetic hormones elaborated by the adrenal cortex (excluding the sex hormones of

adrenal origin) that influence or control key processes of the of the body." *Id.* at 406.

**11.** A bronchodilator is "a substance, especially a drug, that relaxes contractions of the smooth muscle of bronchioles to improve ventilation to the lungs." *Id.* at 230.

of low grade wheezing between asthma attacks, a requirement under 103.03(c)(2) to support a claim of disability.[12] The doctor also stated that the claimant had not had short courses of corticosteroids averaging more than five days per month for at least three months during a 12–month period, another requirement under 103.03(c)(2). (Tr. 34.)

Plaintiff's attorney pointed to the claimant's pharmacy records to show that he had taken corticosteroids for the required amount of time under Listing 103.03(c)(2). Dr. Fechner stated that the corticosteroids that the claimant took were inhaled corticosteroids[13], and were standard medications that did not meet the listing because they were medications that "almost every asthmatic" takes. Dr. Fechner stated that the corticosteroids required by the listing were tablets of prednisone or cortisone taken by mouth; the doctor implied that these steroids were much more powerful than inhaled corticosteroids.[14] The doctor described the difference between inhaled and ingested steroids as being significant because oral corticosteroids are absorbed into the blood stream, while inhaled steroids, which enter the mucosa and bronchial tubes, do not enter the blood stream.[15] Dr. Fechner went on to state that "the only time you get side effects from prolonged steroids is by actually taking it, ingesting it . . ." (Tr. 40.) After questioning from Plaintiff's attorney, Dr. Fechner did admit that inhaled corticosteroids produced side effects such as nervousness and heart palpitations, and that the claimant had been prescribed these medications at least fourteen different times over the last three years. (Tr. 46–48.) Despite this admission, the ALJ relied upon Dr. Fechner's testimony that inhaled corticosteroids do not meet the requirements for disability under 103.03(c)(2). (Tr. 15.)

## DISCUSSION

### A. *Standard of Review*

The Court has jurisdiction to review the Commissioner's decision under 42 U.S.C. § 405(g). The Court must affirm the Commissioner's decision if it is "supported by substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3) (1999); *Stunkard v. Secretary of Health and Human Services*, 841 F.2d 57, 59 (3d Cir.1988); *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir.1986).

---

12. In order to be considered disabled, Listing 103.03(c) requires that a child claimant suffer from persistent low grade wheezing between acute attacks or absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimectic bronchodilators with one of the following: (1) Persistent prolonged expiration with radiographic or other appropriate imaging techniques, evidence of pulmonary hyperinflation or peribronchial disease; or (2) short courses of corticosteroids that average more than five days per month for at least three months during a twelve month period. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 103.03(c)(2). Plaintiff argues that the correct Listing for the claimant is 103.03(c)(2).

13. Corticosteroids may be administered orally, parenterally or topically. *Mosby's* at 406.

14. Prednisone and cortisol are also known as glucocorticoids. A glucocorticoid is "an adrenocortical steroid hormone that influences many bodily hormones." *Mosby's* at 697. Pharmacologic doses of glucocorticosteroids can "retard bone growth of children and inhibit cell division in various developing structures, such as the gastric mucosa, liver, lung and brain." *Id.* at 406.

15. On September 19, 1999, the claimant was prescribed prelone, an oral corticosteroid (glucocorticoid), for two days when he was admitted to the hospital for pneumonia and status asthmaticus. (Tr. 160). During his hospital stay, he was also given Solumedrol, an intravenous corticosteroid with glucocorticoid effects, for two days. (Tr. 277–78.)

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Substantial evidence is "more than a mere scintilla of evidence but may be less than a preponderance." *Brown v. Bowen,* 845 F.2d 1211, 1213 (3d Cir.1988) (citing *Stunkard,* 841 F.2d at 59). Furthermore, the reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the factfinder." *Williams v. Sullivan,* 970 F.2d 1178, 1182 (3d Cir.1992), *cert. denied, Williams v. Shalala,* 507 U.S. 924, 113 S.Ct. 1294, 122 L.Ed.2d 685 (1993) (citing *Early v. Heckler,* 743 F.2d 1002, 1007 (3d Cir.1984)).

**B. *Statutory Standards***

To qualify for SSI benefits, a claimant must first establish that he is disabled. 42 U.S.C. § 1382c(a)(3)(C)(i). Children that have severe limitations must "have an impairment that meets, medically equals, or functionally equals a listing." 20 C.F.R. § 416.924(a). A child will be found to have a disability if he has such an impairment, and that impairment meets the duration requirement. *Id.*

**C. *The Three Step Evaluation Process***

Children seeking Social Security benefits based on a disability are required to follow the three-step process outlined in 20 C.F.R. §§ 416.924 and 416.926a. The examiner makes the following three-step evaluation to determine whether a claimant under the age of 18 is disabled, and thus, entitled to SSI benefits: At step one, if claimant is engaged in substantial gainful activity he is not disabled. At step two, if claimant is not engaged in substantial

gainful activity, then the examiner will determine whether the physical or mental impairment is severe. At step three, if the impairment is severe, the examiner will determine whether the impairment meets, medically equals, or functionally equals an Impairment Listing. 20 C.F.R. § 416.924(b)-(d).

If the child's impairment does not meet a listing under step three above, the examiner determines whether the impairment functionally equals a listing by evaluating the child's six domains of functioning. The six domains of functioning are as follows:

1. Acquiring and using information,

2. Attending and completing tasks,

3. Interacting and relating with others,

4. Moving about and manipulating objects,

5. Caring for yourself, and

6. Health and physical well being.

20 C.F.R. § 416.926a(b)(1). An impairment functionally equals a listing if the child has "marked" limitations in at least two domains, or an "extreme" limitation in at least one domain of the six domains of functioning. 20 C.F.R. § 419.926a(a). Thus, if the child is not engaged in substantial gainful activity, and has a severe impairment, and the child's impairment meets or functionally equals a listing, then the child will be considered disabled and entitled to SSI benefits. 20 C.F.R. § 416.924(b)-(d).

**D. *ALJ Meuhlig's Findings***

The ALJ determined that the claimant was not disabled. (Tr. 17.) ALJ Meuhlig found that the child's impairment was severe, but that it did not equal a listing or a functional equivalent. (*Id.*) Applying the three part test, the ALJ found, under step 1, that the child had never engaged in

substantial gainful activity.[16] (Tr. 15.) Under step 2, the ALJ determined that the child's impairment was severe. (*Id.*) Under step 3, the ALJ determined that the impairment did not equal a listing, specifically listing 103.03. (*Id.*) The ALJ determined that the child's impairment was not functionally equivalent because there were no marked or extreme functional limitations. (Tr. 17.) As such, the ALJ determined that the claimant was not eligible for Supplemental Social Security Income payments.

## E. *Analysis*

Plaintiff argues that ALJ Muehlig's findings were not supported by substantial evidence. Specifically, Plaintiff contends that the ALJ erred by not giving the treating physicians' opinion proper weight, and by not considering contradictory evidence regarding the interpretation of the term "corticosteroid." Plaintiff also argues that the case should be remanded only for the determination of benefits because the record is fully developed and it is clear that claimant meets the statutory requirements for a disability. Finally, Plaintiff contends that if the case is not remanded solely for determining benefits, it should be remanded to a different ALJ with the instruction that "corticosteroid" be interpreted to mean both inhaled and oral corticosteroids.

Defendant concedes that ALJ Muehlig's analysis regarding whether claimant met the criteria of the Listing was deficient, and that the case should be remanded for rehearing. (Def. Br. at 6.) Specifically, Defendant agrees that the ALJ failed to acknowledge "the possible conflicting interpretations of the Listing, which is silent as to the delivery method of corticosteroids, and explain why he resolved the issue in the way that he did." (Def. Br. at 7–8.) However, Defendant argues that the record does not establish a prima facie case for claimant's entitlement, therefore remand, and not an award of benefits, is the proper remedy. (Def. Br. at 12.)

This Court finds that ALJ Muehlig's determination was not supported by substantial evidence. The case is remanded to ALJ Meuhlig with instructions that the term "corticosteroid" be interpreted to mean any type of corticosteroid, pursuant to the plain meaning of the statute.

### 1. *ALJ Muehlig's Ruling Was Not Supported by Substantial Evidence.*

Plaintiff argues that ALJ Meuhlig's decision was not supported by substantial evidence because he did not adequately consider the findings of the claimant's treating physicians. (Pl. Br. at 8.) Plaintiff contends that the ALJ relied upon the opinions of a non-examining Medical Expert and non-examining agency medical consultants, but did not appropriately weigh the opinions of the treating physicians. (Pl. Br. at 9.) Plaintiff also argues that the ALJ erroneously interpreted the term "corticosteroid" to mean oral corti-

---

**16.** Substantial gainful activity is work activity that is both substantial and gainful: (a) *Substantial work activity.* Substantial work activity is work activity that involves doing significant physical or mental activities. Work may be substantial even if it is done on a part-time basis or if a person does less, gets paid less, or has less responsibility than what he or she worked before. (b) *Gainful work activity.* Gainful work activity is work activity that is done for pay or profit. Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized. (c) *Some other activities.* Generally, SSA does not consider activities like taking care of yourself, household tasks, hobbies, therapy, school attendance, club activities, or social programs to be substantial gainful activity. 20 C.F.R. § 416.972

costeroids and not inhaled corticosteroids. (Pl. Br. at 18.)

### a. *ALJ Meuhlig erroneously disregarded the findings of the treating physicians.*

■ The Third Circuit has recognized that a court considering a claim for disability benefits must give greater weight to the findings of a treating physician than to the findings of a physician who has examined the claimant only once or not at all. *Mason v. Shalala,* 994 F.2d 1058, 1067 (3d Cir.1993); *see Kane v. Heckler,* 776 F.2d, 1130, 1135 (3d Cir.1985); *Gilliland v. Heckler,* 786 F.2d 178, 183 (3d Cir.1986); 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). If the ALJ rejects probative evidence from a treating physician, he is required to explain why. See *Cotter v. Harris,* 642 F.2d 700 (3d Cir.1981).

■ In his decision, ALJ Meuhlig referred to Plaintiff's treating physician, Dr. Bonnie Fittleberg, only once, stating that the doctor "noted in September 1999 that the claimant had a prior history of multiple hospitalizations and an intubation as a result of asthma exacerbations. It was indicated that he was on medication management, and would require medications on a life-long basis." (Tr. 14, 255.) The ALJ did not, however, discuss Dr. Fittleberg's findings. Instead, the ALJ relied on the opinions of Dr. Fechner, the non-examining medical expert, who found that the claimant had not met Listing 103.03. ALJ Meuhlig stated that Dr. Fechner's opinion was "adopted, since it represents the rea-

soned impression of a medical specialist, that is consistent with the medical documentation." (Tr. 15.) ALJ Meuhlig failed to explain why he gave greater weight to the opinion of Dr. Fechner than to the opinions of the physicians at the Center for Family Health, who treated the claimant and found that his asthma was severe. ALJ Meuhlig also failed to address additional probative evidence such as physician reports describing the claimant's wheezing, use of corticosteroids, and use of bronchodilators. For example, several reports from the Center of Family Health describe the claimant as experiencing wheezing in his lungs and coughing. (Tr. 233, 243, 185.) The claimant's prescription records also show that the claimant was prescribed several bronchodilators and corticosteroids from September 18, 1999 to October 24, 2001. (Tr. 22–25, 183, 277–78.) This evidence was relevant to a finding of a disability pursuant to Listing 103.03(c)(2).

■ In making his decision, the ALJ must consider all evidence. *Doak v. Heckler,* 790 F.2d 26, 29 (3d Cir.1986). The ALJ must also note which evidence he rejects and provide reasons for the rejection. *Burnett,* 220 F.3d at 121.

### b. *ALJ Meuhlig improperly interpreted the term "corticosteroid."*

■ Plaintiff argues that on remand, this Court should give specific orders that the term "corticosteroid" be interpreted to mean corticosteroids taken by any method of delivery, pursuant to the plain meaning of the statute. (Pl. Br. at 18–19.) [17] Plain-

---

**17.** During Plaintiff's hearing, Dr. Fechner testified that the claimant did not meet the corticosteroid requirement of 103.03(c)(2) because he took inhaled rather than oral corticosteroids. (Tr. 39.) When questioned by Plaintiff's attorneys as to the difference between the two, Dr. Fechner testified that oral corticosteroids enter the bloodstream and result in

side effects, while inhaled corticosteroids do not. (Tr. 40.) Yet further questioning by Plaintiff's attorneys revealed that inhaled corticosteroids also result in side effects. (Tr. 46.) Despite evidence that Plaintiff presented suggesting that inhaled corticosteroids do enter the bloodstream, ALJ Meuhlig failed to address this conflicting argument in his deci-

tiff contends that the interpretation of Listing 103.03(c)(2) is a legal question that should be decided by this Court. (Pl. Reply Br. at 11.)

■ Where the language of a Social Security regulation is plain and unambiguous, no further inquiry or interpretation of a term is needed. *See Burns v. Barnhart,* 312 F.3d 113, 125 (3d Cir.2002) (quoting *Idahoan Fresh v. Advantage Produce, Inc.,* 157 F.3d 197, 202 (3d Cir.1998)). In *Burns,* the Social Security regulation in dispute clearly established the IQ standard for mental retardation as between 60 and 70. The claimant in *Burns,* who was seeking disability for mental retardation, had an IQ of 75. The claimant presented evidence suggesting that IQ tests are often off by five or more points, therefore his score of 75 could possibly fall in the range of mental retardation. The Court dismissed this argument, stating that the language of the statute was clear, and that the claimant had not provided any evidence to suggest that the SSA had not already considered this error when the regulation was created. *See Id.* at 125–26.

■ The language of 103.03(c)(2) is clear and unambiguous. A child claiming disability must take "short courses of corticosteroids that average more than five days per month for at least three months during a twelve month period." The Listing specifies how often and for how long corticosteroids are to be taken, but is silent as to how the corticosteroids are to be administered. As Plaintiff points out, several parts of the disability listings were revised in 1997, yet the SSA chose not to amend Listing 103.03(c)(2). (Pl. Reply Br. at 10.) It would be unfair to allow an ALJ to create a distinction between inhaled and oral corticosteroids, when that distinction

does not appear in the statute. A reviewing court need only defer to an interpretation when it is reasonable. *See West v. Bowen,* 879 F.2d 1122, 1124 (3d Cir.1989). On remand, the term "corticosteroid," shall be interpreted to include corticosteroids taken by any method of delivery.

**2. *The case should be remanded to ALJ Meuhlig for further inquiry and development of the record.***

■ Plaintiff claims that this case should be remanded only for the determination of benefits. (Pl. Br. at 39.) Plaintiff contends that the claimant clearly meets the requirement of a disability under 103.03(c)(2) because he experiences "persistent" low grade wheezing, uses bronchodilators nightly, and frequently uses corticosteroids.

■ "A reversal, as opposed to a remand, is in order only where a fully developed administrative record demonstrates that the claimant is clearly entitled to benefits, and thus a new administrative hearing would serve no useful purpose." *Podedworny v. Harris,* 745 F.2d 210, 224 (3d Cir.1984). If the ALJ's explanation of his decision is "hopelessly inadequate," the case should be vacated and remanded to the ALJ to fully develop the record and explain his findings. *Burnett v. Social Security,* 220 F.3d 112, 120 (3d Cir.2000). Furthermore, if there is a dispute between the evidence in the record, the case must be remanded "for further factual findings." *See Id.* at 126.

Plaintiff argues that the record has been fully developed and it is clear that the claimant is entitled to Social Security benefits because he meets Listing 103.03(c)(2). (Pl. Br. at 39.) Plaintiff points to prescription records, witness testimony, and medical records to support his contention that the claimant has had consistent low grade

sion. Instead, the ALJ, without using the term "corticosteroid," stated, "moreover, the

medications taken by the claimant are inhaled, and not internal." (Tr. 15.)

wheezing, must use bronchodilators daily, and has used short courses of corticosteroids.

The record does not establish a prima facie case for claimant's entitlement to benefits. First, Defendant points to several medical records which suggest that the claimant did not experience the persistent low-grade wheezing required under 103.03(c). (Def. Br. at 10–12.) Defendant also argues that there may be a possible link between the claimant's symptoms and his refusal to take medication. (Def. Br. at 11.) ALJ Meuhlig noted in his decision that clinic records revealed that the claimant was not taking his asthma medications because his father was concerned about the side effects of long-term steroid use. (Tr. 14.) Where a claimant alleges that medication causes severe side effects, the case should be remanded to the ALJ for further inquiry to determine if the necessary medications do cause side effects and if those side effects are disabling. *See Evans v. Bowen*, 1986 WL 10559, *7, 1986 U.S. Dist. LEXIS 20304, *18–19 (E.D.Pa. 1986) (quoting *Figueroa v. Secretary of Health, Education and Welfare*, 585 F.2d 551 (1st Cir.1978)).

As discussed above, ALJ Meuhlig's analysis of the evidence was inadequate. A new administrative hearing will allow the ALJ to determine the side effects of claimant's prescribed medications, and whether they are disabling. In addition to this Court's pronouncement on the interpretation of the term "corticosteroid," the ALJ is also instructed to consider the evidence in the record supporting claimant's alleged persistent wheezing, and reasons, if applicable, for rejecting such evidence.

### 3. *The case should be remanded to ALJ Meuhlig and not to a different ALJ.*

▆▆ Plaintiff argues that if his case is not remanded solely for the determination of benefits, it should be remanded to a different ALJ for rehearing. (Pl. Reply Br. at 11–12.) Plaintiff claims that ALJ Meuhlig created an adverse environment which prevented the claimant from receiving a full and fair hearing. (Pl. Reply Br. at 11.) Plaintiff alleges that ALJ Meuhlig created a hostile environment by repeatedly and rudely interrupting Plaintiff's attorney's questioning of Dr. Fechner. (Pl. Reply Br. at 12.) Plaintiff also contends that the claimant was unable to receive a fair hearing because ALJ Meuhlig was confused about the applicable listing and also failed to explain why the Medical Expert's testimony was necessary. (Pl. Reply Br. at 13.)

▆▆ Under the SSA's Hearings, Appeals, and Litigation Law Manual, section I–2–6–1, an ALJ is required to conduct a Social Security hearing "in a fair and impartial manner." The Third Circuit has repeatedly held that Social Security hearings are not to be adversarial. *Hess v. Sec. of H.E.W.*, 497 F.2d 837, 840 (3d Cir.1974). If an ALJ acts with extreme impatience, hostility or condescension towards a plaintiff or the plaintiff's representative during a hearing, that case should be remanded to a different ALJ. *See Ventura v. Shalala*, 55 F.3d 900 (3d Cir.1995); *Rosa v. Bowen*, 677 F.Supp. 782 (D.N.J. 1988). In both *Ventura* and *Rosa*, the ALJs levied personal attacks against the plaintiffs' legal representatives. In *Ventura*, after admonishing the Plaintiff's representative for using leading questions, the ALJ "continued to intimidate the claimant's representative" by telling him: "you're not doing one damn thing to help him [the claimant]. So why don't you sit back and listen for a second." *Ventura*, 55 F.3d at 903. The Circuit found this behavior to be "offensive and unprofessional con-

duct," and held that the claimant was entitled to a new hearing before a new judge. *Id.* at 905.

In *Rosa*, the court found that the "ALJ's most pressing concern was expedience" and that the hearing was "shameful in its atmosphere of alternating indifference, personal musings, impatience and condescension." *Rosa*, 677 F.Supp. at 783. The court described the ALJ's treatment of the claimant's attorney as "harassment." *Id.* at 784. For example, when the attorney attempted to question the time limitations placed on him by the ALJ, the ALJ's response was "take exception all you want. We start the next case at quarter of ten." *Id.* The ALJ later told the attorney to hurry because he had "one last question. Make it a good one." *Id.* The Court held that the ALJ's behavior created an unfair hearing that prevented the claimant from receiving a full and fair hearing. *Id.* at 785.

Plaintiff claims that ALJ Meuhlig repeatedly interrupted Plaintiff's questioning of the Medical Expert. (Pl. Reply Br. at 12.) When the attorney attempted to ascertain Dr. Fechner's expertise in childhood asthma, the ALJ interrupted, "Madam, don't go there, he is well qualified so I wouldn't waste time with that." (Tr. 38). Yet, claimant's attorney was later able to glean that the doctor did not treat children under sixteen and did not sub-specialize in pulmonology. (Tr. 42.) The attorney was able to elicit this information with no interruption from the ALJ. (Tr. 42.) Plaintiff also argues that ALJ Meuhlig was adversarial when he insisted that the Medical Expert would refer to the correct listing for the claimant. (Pl. Reply Br. at 12). Yet the transcript shows the Plaintiff's attorney later clarified the correct listing with the ALJ, and the ALJ recorded the correct listing. (Tr. 52.)

Contrary to Plaintiff's contention, ALJ Meuhlig's statements do not meet the level of offensiveness and unprofessional conduct established in *Rosa* and *Ventura*. There is no evidence that the ALJ acted in an unfair and biased manner. ALJ Meuhlig did not display extreme impatience or condescension during the hearing. The attorneys did not endure the verbal taunts levied at the attorneys in *Rosa* and *Ventura*. Other mistakes that the Plaintiff notes, such as the ALJ's failure to explain why a Medical Expert was necessary, and his confusion about the correct medical listing for the claimant, are issues that can and must be addressed and clarified on remand to ALJ Meuhlig. Yet, despite these errors, the record does not support the contention that ALJ Meuhlig acted in such an adversarial manner as to prevent the claimant from receiving a fair hearing.

### *CONCLUSION*

For the foregoing reasons, this Court finds that substantial evidence does not exist to support the Commissioner's determination that the claimant is not disabled under Listing 103.03(c)(2). This case is REMANDED so that the ALJ may develop the record and explain his findings.